## Case No. 14,891.

### UNITED STATES ex rel. STANDING BEAR v. CROOK.

[5 Dill. 453.] [1]

Circuit Court, D. Nebraska. 1879.

HABEAS CORPUS—RIGHT OF INDIAN TO WRIT—REMOVAL INTO INDIAN TERRITORY—CONSENT OF INDIANS.

1. An Indian is a "person" within the meaning of the habeas corpus act, and as such is entitled to sue out a writ of habeas corpus in the federal courts when it is shown that the petitioner is deprived of liberty under color of authority of the United States, or is in custody of an officer in violation of the constitution or a law of the United States, or in violation of a treaty made in pursuance thereof.

2. The right of expatriation is a natural, inherent, and inalienable right, and extends to the Indian as well as to the white race.

[Cited in Elk v. Wilkins, 112 U. S. 120, 5 Sup. Ct. 55.]

3. The commissioner of Indian affairs has ample authority for removing from an Indian reservation all persons found thereon without authority of law, or whose presence may be detrimental to the peace and welfare of the Indians.

4. The military power of the government may be employed to effect such removal; but where the removal is effected, it is the duty of the troops to convey the persons so removed, by the most convenient and safe route, to the civil authorities of the judicial district in which the offence may be committed, to be proceeded against in due course of law. In time of peace, no authority, civil or military, exists for transporting Indians from one section of the country to another, without the consent of the Indians, nor to confine them to any particular reservation against their will; and where officers of the government attempt to do this, and arrest and hold Indians who are at peace with the government, for the purpose of removing them to and confining them on a reservation in the Indian Territory, they will be released on habeas corpus.

[Cited in Elk v. Wilkins, 112 U. S. 109, 5 Sup. Ct. 49.]

[This was a hearing upon return to writ of habeas corpus issued against George Crook, a brigadier-general of the army of the United States, at the relation of Standing Bear and other Indians, formerly belonging to the Ponca tribe of Indians.]

A. J. Poppleton and John L. Webster, for relators.

G. M. Lambertson, U. S. Atty.

DUNDY, District Judge. During the fifteen years in which I have been engaged in administering the laws of my country, I have never been called upon to hear or decide a case that appealed so strongly to my sympathy as the one now under consideration. On the one side, we have a few of the remnants of a once numerous and powerful, but now weak, insignificant, unlettered, and generally despised race; on the other, we have the representative of one of the most powerful, most enlightened, and most Christianized nations of modern times. On the one

1 [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

side, we have the representatives of this wasted race coming into this national tribunal of ours, asking for justice and liberty to enable them to adopt our boasted civilization, and to pursue the arts of peace, which have made us great and happy as a nation; on the other side, we have this magnificent, if not magnanimous, government, resisting this application with the determination of sending these people back to the country which is to them less desirable than perpetual imprisonment in their own native land. But I think it is creditable to the heart and mind of the brave and distinguished officer who is made respondent herein to say that he has no sort of sympathy in the business in which he is forced by his position to bear a part so conspicuous; and, so far as I am individually concerned, I think it not improper to say that, if the strongest possible sympathy could give the relators title to freedom, they would have been restored to liberty the moment the arguments in their behalf were closed. No examination or further thought would then have been necessary or expedient. But in a country where liberty is regulated by law, something more satisfactory and enduring than mere sympathy must furnish and constitute the rule and basis of judicial action. It follows that this case must be examined and decided on principles of law, and that unless the relators are entitled to their discharge under the constitution or laws of the United States, or some treaty made pursuant thereto, they must be remanded to the custody of the officer who caused their arrest, to be returned to the Indian Territory, which they left without the consent of the government.

On the 8th of April, 1879, the relators, Standing Bear and twenty-five others, during the session of the court held at that time at Lincoln, presented their petition, duly verified, praying for the allowance of a writ of habeas corpus and their final discharge from custody thereunder.

The petition alleges, in substance, that the relators are Indians who have formerly belonged to the Ponca tribe of Indians, now located in the Indian Territory; that they had some time previously withdrawn from the tribe, and completely severed their tribal relations therewith, and had adopted the general habits of the whites, and were then endeavoring to maintain themselves by their own exertions, and without aid or assistance from the general government; that whilst they were thus engaged, and without being guilty of violating any of the laws of the United States, they were arrested and restrained of their liberty by order of the respondent, George Crook.

The writ was issued and served on the respondent on the 8th day of April, and, the distance between the place where the writ was made returnable and the place where the relators were confined being more than

twenty miles, ten days were allotted in which to make return.

On the 18th of April the writ was returned, and the authority for the arrest and detention is therein shown. The substance of the return to the writ, and the additional statement since filed, is that the relators are individual members of, and connected with, the Ponca tribe of Indians; that they had fled or escaped from a reservation situated some place within the limits of the Indian Territory—had departed therefrom without permission from the government; and, at the request of the secretary of the interior, the general of the army had issued an order which required the respondent to arrest and return the relators to their tribe in the Indian Territory, and that, pursuant to the said order, he had caused the relators to be arrested on the Omaha Indian reservation, and that they were in his custody for the purpose of being returned to the Indian Territory.

It is claimed upon the one side, and denied upon the other, that the relators had withdrawn and severed, for all time, their connection with the tribe to which they belonged; and upon this point alone was there any testimony produced by either party hereto. The other matters stated in the petition and the return to the writ are conceded to be true; so that the questions to be determined are purely questions of law.

On the 8th of March, 1859, a treaty was made by the United States with the Ponca tribe of Indians, by which a certain tract of country, north of the Niobrara river and west of the Missouri, was set apart for the permanent home of the said Indians, in which the government agreed to protect them during their good behavior. But just when, or how, or why, or under what circumstances, the Indians left their reservation in Dakota and went to the Indian Territory, does not appear.

The district attorney very earnestly questions the jurisdiction of the court to issue the writ, and to hear and determine the case made herein, and has supported his theory with an argument of great ingenuity and much ability. But, nevertheless, I am of the opinion that his premises are erroneous, and his conclusions, therefore, wrong and unjust. The great respect I entertain for that officer, and the very able manner in which his views were presented, make it necessary for me to give somewhat at length the reasons which lead me to this conclusion.

The district attorney discussed at length the reasons which led to the origin of the writ of habeas corpus, and the character of the proceedings and practice in connection therewith in the parent country. It was claimed that the laws of the realm limited the right to sue out this writ to the free subjects of the kingdom, and that none others came within the benefits of such beneficent laws; and, reasoning from analogy, it is claimed that none but American citizens are entitled to sue out this high prerogative writ in any of the federal courts. I have not examined the English laws regulating the suing out of the writ, nor have I thought it necessary so to do. Of this I will only observe that if the laws of England are as they are claimed to be, they will appear at a disadvantage when compared with our own. This only proves that the laws of a limited monarchy are sometimes less wise and humane than the laws of our own republic—that whilst the parliament of Great Britain was legislating in behalf of the favored few, the congress of the United States was legislating in behalf of all mankind who come within our jurisdiction.

Section 751 of the Revised Statutes declares that "the supreme court and the circuit and district courts shall have power to issue writs of habeas corpus." Section 752 confers the power to issue writs on the judges of said courts, within their jurisdiction, and declares this to be "for the purpose of inquiry into the cause of restraint of liberty." Section 753 restricts the power, limits the jurisdiction, and defines the cases where the writ may properly issue. That may be done under this section where the prisoner "is in custody under or by color of authority of the United States, * * * or is in custody for an act done or omitted in pursuance of a law of the United States, * * * or in custody in violation of the constitution or of a law or treaty of the United States." Thus, it will be seen that when a person is in custody or deprived of his liberty under color of authority of the United States, or in violation of the constitution or laws or treaties of the United States, the federal judges have jurisdiction, and the writ can properly issue. I take it that the true construction to be placed upon this act is this, that in all cases where federal officers, civil or military, have the custody and control of a person claimed to be unlawfully restrained of liberty, they are then restrained of liberty under color of authority of the United States, and the federal courts can properly proceed to determine the question of unlawful restraint, because no other courts can properly do so. In the other instance, the federal courts and judges can properly issue the writ in all cases where the person is alleged to be in custody in violation of the constitution or a law or treaty of the United States. In such a case, it is wholly immaterial what officer, state or federal, has custody of the person seeking the relief. These relators may be entitled to the writ in either case. Under the first paragraph they certainly are—that is, if an Indian can be entitled to it at all—because they are in custody of a federal officer, under color of authority of the United States. And they may be entitled to the writ under the other par-

agraph, before recited, for the reason, as they allege, that they are restrained of liberty in violation of a provision of their treaty, before referred to. Now, it must be borne in mind that the habeas corpus act describes applicants for the writ as "persons," or "parties," who may be entitled thereto. It nowhere describes them as "citizens," nor is citizenship in any way or place made a qualification for suing out the writ, and, in the absence of express provision or necessary implication which would require the interpretation contended for by the district attorney, I should not feel justified in giving the words "person" and "party" such a narrow construction. The most natural, and therefore most reasonable, way is to attach the same meaning to words and phrases when found in a statute that is attached to them when and where found in general use. If we do so in this instance, then the question cannot be open to serious doubt. Webster describes a person as "a living soul; a self-conscious being; a moral agent; especially a living human being; a man, woman, or child; an individual of the human race." This is comprehensive enough, it would seem, to include even an Indian. In defining certain generic terms, the first section of the Revised Statutes, declares that the word "person" includes copartnerships and corporations. On the whole, it seems to me quite evident that the comprehensive language used in this section is intended to apply to all mankind—as well the relators as the more favored white race. This will be doing no violence to language, or to the spirit or letter of the law, nor to the intention, as it is believed, of the law-making power of the government. I must hold, then, that Indians, and consequently the relators, are "persons," such as are described by and included, within the laws before quoted. It is said, however, that this is the first instance on record in which an Indian has been permitted to sue out and maintain a writ of habeas corpus in a federal court, and therefore the court must be without jurisdiction in the premises. This is a non sequitur. I confess I do not know of another instance where this has been done, but I can also say that the occasion for it perhaps has never before been so great. It may be that the Indians think it wiser and better, in the end, to resort to this peaceful process than it would be to undertake the hopeless task of redressing their own alleged wrongs by force of arms. Returning reason, and the sad experience of others similarly situated, have taught them the folly and madness of the arbitrament of the sword. They can readily see that any serious resistance on their part would be the signal for their utter extermination. Have they not, then, chosen the wiser part by resorting to the very tribunal erected by those they claim have wronged and oppressed them? This, however, is not the tribunal of their own choice, but it is the only one into which they can lawfully go for deliverance. It cannot, therefore, be fairly said that because no Indian ever before invoked the aid of this writ in a federal court, the rightful authority to issue it does not exist. Power and authority rightfully conferred do not necessarily cease to exist in consequence of long non-user. Though much time has elapsed, and many generations have passed away, since the passage of the original habeas corpus act, from which I have quoted, it will not do to say that these Indians cannot avail themselves of its beneficent provisions simply because none of their ancestors ever sought relief thereunder.

Every "person" who comes within our jurisdiction, whether he be European, Asiatic, African, or "native to the manor born," must obey the laws of the United States. Every one who violates them incurs the penalty provided thereby. When a "person" is charged, in a proper way, with the commission of crime, we do not inquire upon the trial in what country the accused was born, nor to what sovereign or government allegiance is due, nor to what race he belongs. The questions of guilt and innocence only form the subjects of inquiry. An Indian, then, especially off from his reservation, is amenable to the criminal laws of the United States, the same as all other persons. They being subject to arrest for the violation of our criminal laws, and being "persons" such as the law contemplates and includes in the description of parties who may sue out the writ, it would indeed be a sad commentary on the justice and impartiality of our laws to hold that Indians, though natives of our own country, cannot test the validity of an alleged illegal imprisonment in this manner, as well as a subject of a foreign government who may happen to be sojourning in this country, but owing it no sort of allegiance. I cannot doubt that congress intended to give to every person who might be unlawfully restrained of liberty under color of authority of the United States, the right to the writ and a discharge thereon. I conclude, then, that, so far as the issuing of the writ is concerned, it was properly issued, and that the relators are within the jurisdiction conferred by the habeas corpus act.

A question of much greater importance remains for consideration, which, when determined, will be decisive of this whole controversy. This relates to the right of the government to arrest and hold the relators for a time, for the purpose of being returned to a point in the Indian Territory from which it is alleged the Indians escaped. I am not vain enough to think that I can do full justice to a question like the one under consideration. But, as the matter furnishes so much valuable material for discussion,

and so much food for reflection, I shall try to present it as viewed from my own standpoint, without reference to consequences or criticisms, which, though not specially invited, will be sure to follow.

A review of the policy of the government adopted in its dealings with the friendly tribe of Poncas, to which the relators at one time belonged, seems not only appropriate, but almost indispensable to a correct understanding of this controversy. The Ponca Indians have been at peace with the government, and have remained the steadfast friends of the whites, for many years. They lived peaceably upon the land and in the country they claimed and called their own.

On the 12th of March, 1858, they made a treaty with the United States, by which they ceded all claims to lands, except the following tract: "Beginning at a point on the Niobrara river, and running due north so as to intersect the Ponca river twenty-five miles from its mouth; thence from said point of intersection up and along the Ponca river twenty miles; thence due south to the Niobrara river; and thence down and along said river to the place of beginning; which tract is hereby reserved for the future homes of said Indians." In consideration of this cession, the government agreed "to protect the Poncas in the possession of the tract of land reserved for their future homes, and their persons and property thereon, during good behavior on their part." Annuities were to be paid them for thirty years, houses were to be built, schools were to be established, and other things were to be done by the government, in consideration of said cession. See 12 Stat. 997.

On the 10th of March, 1865, another treaty was made, and a part of the other reservation was ceded to the government. Other lands, however, were, to some extent, substituted therefor, "by way of rewarding them for their constant fidelity to the government, and citizens thereof, and with a view of returning to the said tribe of Ponca Indians their old burying-grounds and cornfields." This treaty also provides for paying $15,080 for spoliations committed on the Indians. See 14 Stat. 675.

On the 29th day of April, 1868, the government made a treaty with the several bands of Sioux Indians, which treaty was ratified by the senate on the 16th of the following February, in and by which the reservations set apart for the Poncas under former treaties were completely absolved. 15 Stat. 635. This was done without consultation with, or knowledge or consent on the part of, the Ponca tribe of Indians.

On the 15th of August, 1876, congress passed the general Indian appropriation bill, and in it we find a provision authorizing the secretary of the interior to use $25,000 for the removal of the Poncas to the Indian Territory, and providing them a home therein, with consent of the tribe. 19 Stat. 192.

In the Indian appropriation bill passed by congress on the 27th day of May. 1878, we find a provision authorizing the secretary of the interior to expend the sum of $30,000 for the purpose of removing and locating the Ponca Indians on a new reservation, near the Kaw river.

No reference has been made to any other treaties or laws, under which the right to arrest and remove the Indians is claimed to exist.

The Poncas lived upon their reservation in southern Dakota, and cultivated a portion of the same, until two or three years ago, when they removed therefrom, but whether by force or otherwise does not appear. At all events, we find a portion of them, including the relators, located at some point in the Indian Territory. There, the testimony seems to show, is where the trouble commenced. Standing Bear, the principal witness, states that out of five hundred and eighty-one Indians who went from the reservation in Dakota to the Indian Territory, one hundred and fifty-eight died within a year or so, and a great proportion of the others were sick and disabled, caused, in a great measure, no doubt, from change of climate; and to save himself and the survivors of his wasted family, and the feeble remnant of his little band of followers, he determined to leave the Indian Territory and return to his old home, where, to use his own language, "he might live and die in peace, and be buried with his fathers." He also states that he informed the agent of their final purpose to leave, never to return, and that he and his followers had finally, fully, and forever severed his and their connection with the Ponca tribe of Indians, and had resolved to disband as a tribe, or band, of Indians, and to cut loose from the government, go to work, become self-sustaining, and adopt the habits and customs of a higher civilization. To accomplish what would seem to be a desirable and laudable purpose, all who were able so to do went to work to earn a living. The Omaha Indians, who speak the same language, and with whom many of the Poncas have long continued to intermarry, gave them employment and ground to cultivate, so as to make them self-sustaining. And it was when at the Omaha reservation, and when thus employed, that they were arrested by order of the government, for the purpose of being taken back to the Indian Territory. They claim to be unable to see the justice. or reason. or wisdom, or necessity, of removing them by force from their own native plains and blood relations to a far-off country, in which they can see little but new-made graves opening for their reception. The land from which they fled in fear has no attractions for them. The love of home and native land was strong enough in the minds of these people to induce them to brave every peril to return and live and die where they had been reared. The bones of the dead son

of Standing Bear were not to repose in the land they hoped to be leaving forever, but were carefully preserved and protected, and formed a part of what was to them a melancholy procession homeward. Such instances of parental affection, and such love of home and native land, may be heathen in origin, but it seems to me that they are not unlike Christian in principle.

What is here stated in this connection is mainly for the purpose of showing that the relators did all they could to separate themselves from their tribe and to sever their tribal relations, for the purpose of becoming self-sustaining and living without support from the government. This being so, it presents the question as to whether or not an Indian can withdraw from his tribe, sever his tribal relation therewith, and terminate his allegiance thereto, for the purpose of making an independent living and adopting our own civilization.

If Indian tribes are to be regarded and treated as separate but dependent nations, there can be no serious difficulty about the question. If they are not to be regarded and treated as separate, dependent nations, then no allegiance is owing from an individual Indian to his tribe, and he could, therefore, withdraw therefrom at any time. The question of expatriation has engaged the attention of our government from the time of its very foundation. Many heated discussions have been carried on between our own and foreign governments on this great question, until diplomacy has triumphantly secured the right to every person found within our jurisdiction. This right has always been claimed and admitted by our government, and it is now no longer an open question. It can make but little difference, then, whether we accord to the Indian tribes a national character or not, as in either case I think the individual Indian possesses the clear and God-given right to withdraw from his tribe and forever live away from it, as though it had no further existence. If the right of expatriation was open to doubt in this country down to the year 1868, certainly since that time no sort of question as to the right can now exist. On the 27th of July of that year congress passed an act, now appearing as section 1999 of the Revised Statutes, which declares that: "Whereas, the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness; and, whereas, in the recognition of this principle the government has freely received emigrants from all nations, and invested them with the rights of citizenship. * * * Therefore, any declaration, instruction, opinion, order, or decision of any officer of the United States which denies, restricts, impairs, or questions the right of expatriation, is declared inconsistent with the fundamental principles of the republic."

This declaration must forever settle the question until it is reopened by other legislation upon the same subject. This is, however, only reaffirming in the most solemn and authoritative manner a principle well settled and understood in this country for many years past.

In most, if not all, instances in which treaties have been made with the several Indian tribes, where reservations have been set apart for their occupancy, the government has either reserved the right or bound itself to protect the Indians thereon. Many of the treaties expressly prohibit white persons being on the reservations unless specially authorized by the treaties or acts of congress for the purpose of carrying out treaty stipulations.

Laws passed for the government of the Indian country, and for the purpose of regulating trade and intercourse with the Indian tribes, confer upon certain officers of the government almost unlimited power over the persons who go upon the reservations without lawful authority. Section 2149 of the Revised Statutes authorizes and requires the commissioner of Indian affairs, with the approval of the secretary of the interior, to remove from any "tribal reservation" any person being thereon without authority of law, or whose presence within the limits of the reservation may, in the judgment of the commissioner, be detrimental to the peace and welfare of the Indians. The authority here conferred upon the commissioner fully justifies him in causing to be removed from Indian reservations all persons thereon in violation of law, or whose presence thereon may be detrimental to the peace and welfare of the Indians upon the reservations. This applies as well to an Indian as to a white person, and manifestly for the same reason, the object of the law being to prevent unwarranted interference between the Indians and the agent representing the government. Whether such an extensive discretionary power is wisely vested in the commissioner of Indian affairs or not, need not be questioned. It is enough to know that the power rightfully exists, and, where existing, the exercise of the power must be upheld. If, then, the commissioner has the right to cause the expulsion from the Omaha Indian reservation of all persons thereon who are there in violation of law, or whose presence may be detrimental to the peace and welfare of the Indians, then he must of necessity be authorized to use the necessary force to accomplish his purpose. Where, then, is he to look for this necessary force? The military arm of the government is the most natural and most potent force to be used on such occasions, and section 2150 of the Revised Statutes, specially authorizes the use of the army for this service. The army, then, it seems, is the proper force to employ when intruders and trespassers who go upon the reservations are to be ejected therefrom.

The first subdivision of the Revised Stat-

utes last referred to provides that "the military forces of the United States may be employed; in such manner and under such regulations as the president may direct, in the apprehension of every person who may be in the Indian country in violation of law, and in conveying him immediately from the Indian country, by the nearest convenient and safe route, to the civil authority of the territory or judicial district in which such person shall be found, to be proceeded against in due course of law." This is the authority under which the military can be lawfully employed to remove intruders from an Indian reservation. What may be done by the troops in such cases is here fully and clearly stated; and it is this authority, it is believed, under which the respondent acted.

All Indian reservations held under treaty stipulations with the government must be deemed and taken to be a part of the "Indian country," within the meaning of our laws on that subject. The relators were found upon the Omaha Indian reservation. That being a part of the Indian country, and they not being a part of the Omaha tribe of Indians, they were there without lawful authority, and if the commissioner of Indian affairs deemed their presence detrimental to the peace and welfare of the Omaha Indians, he had lawful warrant to remove them from the reservation, and to employ the necessary military force to effect this object in safety.

General Crook had the rightful authority to remove the relators from the reservation, and must stand justified in removing them therefrom. But when the troops are thus employed they must exercise the authority in the manner provided by the section of the law just read. This law makes it the duty of the troops to convey the parties arrested, by the nearest convenient and safe route, to the civil authority of the territory or judicial district in which such persons shall be found, to be proceeded against in due course of law. The duty of the military authorities is here very clearly and sharply defined, and no one can be justified in departing therefrom, especially in time of peace. As General Crook had the right to arrest and remove the relators from the Omaha Indian reservation, it follows, from what has been stated, that the law required him to convey them to this city and turn them over to the marshal and United States attorney, to be proceeded against in due course of law. Then proceedings could be instituted against them in either the circuit or district court, and if the relators had incurred a penalty under the law, punishment would follow; otherwise, they would be discharged from custody. But this course was not pursued in this case; neither was it intended to observe the laws in that regard, for General Crook's orders, emanating from higher authority, expressly required him to apprehend the relators and remove them by force to the Indian Territory, from which it is al-

leged they escaped. But in what General Crook has done in the premises no fault can be imputed to him. He was simply obeying the orders of his superior officers, but the orders, as we think, lack the necessary authority of law, and are, therefore, not binding on the relators.

I have searched in vain for the semblance of any authority justifying the commissioner in attempting to remove by force any Indians, whether belonging to a tribe or not, to any place, or for any other purpose than what has been stated. Certainly, without some specific authority found in an act of congress, or in a treaty with the Ponca tribe of Indians, he could not lawfully force the relators back to the Indian Territory, to remain and die in that country, against their will. In the absence of all treaty stipulations or laws of the United States authorizing such removal, I must conclude that no such arbitrary authority exists. It is true, if the relators are to be regarded as a part of the great nation of Ponca Indians, the government might, in time of war, remove them to any place of safety so long as the war should last, but perhaps no longer, unless they were charged with the commission of some crime. This is a war power merely, and exists in time of war only. Every nation exercises the right to arrest and detain an alien enemy during the existence of a war, and all subjects or citizens of the hostile nations are subject to be dealt with under this rule.

But it is not claimed that the Ponca tribe of Indians are at war with the United States, so that this war power might be used against them; in fact, they are amongst the most peaceable and friendly of all the Indian tribes, and have at times received from the government unmistakable and substantial recognition of their long-continued friendship for the whites. In time of peace the war power remains in abeyance, and must be subservient to the civil authority of the government until something occurs to justify its exercise. No fact exists, and nothing has occurred, so far as the relators are concerned, to make it necessary or lawful to exercise such an authority over them. If they could be removed to the Indian Territory by force, and kept there in the same way, I can see no good reason why they might not be taken and kept by force in the penitentiary at Lincoln, or Leavenworth, or Jefferson City, or any other place which the commander of the forces might, in his judgment, see proper to designate. I cannot think that any such arbitrary authority exists in this country.

The reasoning advanced in support of my views, leads me to conclude:

1. That an Indian is a "person" within the meaning of the laws of the United States, and has, therefore, the right to sue out a writ of habeas corpus in a federal court, or before a federal judge, in all cases where he may be confined or in custody under color of author-

ity of the United States, or where he is restrained of liberty in violation of the constitution or laws of the United States.

2. That General George Crook, the respondent, being commander of the military department of the Platte, has the custody of the relators, under color of authority of the United States, and in violation of the laws thereof.

3. That no rightful authority exists for removing by force any of the relators to the Indian Territory, as the respondent has been directed to do.

4. That the Indians possess the inherent right of expatriation, as well as the more fortunate white race, and have the inalienable right to "life, liberty, and the pursuit of happiness," so long as they obey the laws and do not trepass on forbidden ground. And,

5. Being restrained of liberty under color of authority of the United States, and in violation of the laws thereof, the relators must be discharged from custody, and it is so ordered.

Ordered accordingly.

NOTE. At the May term, 1879, Mr. Justice Miller refused to hear an appeal prosecuted by the United States, because the Indians who had petitioned for the writ of habeas corpus were not present, having been released by the order of Dundy, District Judge, and no security for their appearance having been taken.