**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RUSSELL MEANS,
              *Petitioner-Appellant,*

v.

NAVAJO NATION, a federally
recognized Indian Tribe; RAY
GILMORE, Judge of the Judicial
District of Chinle, Navajo Nation,
Arizona; ROBERT YAZZIE, Chief
Justice of the Navajo Nation,
              *Respondents-Appellees,*

and

UNITED STATES OF AMERICA,
              *Respondent-Intervenor-
                    Appellee.*

No. 01-17489

D.C. No.
CV-99-01057-EHC

ORDER AND
OPINION

Appeal from the United States District Court
for the District of Arizona
Earl H. Carroll, District Judge, Presiding

Argued and Submitted October 10, 2002
Submission withdrawn November 19, 2003

Resubmitted January 28, 2005*
San Francisco, California

---

*We withdrew submission of this case when the Supreme Court granted certiorari in *United States v. Lara*, 324 F.3d 635 (8th Cir.), *cert. granted*, 539 U.S. 987 (2003), *rev'd*, 541 U.S. 493 (2004), because *Lara* appeared likely to resolve many of the important and difficult issues presented in this case. *Lara* was decided April 19, 2004, but on June 10, 2004, the United States advised the court that because this case challenged the constitutionality of a federal statute, the United States was entitled to intervene. *See* 28 U.S.C. § 2403(a); Fed. R. App. P. 44. The United States filed a motion to intervene as of right on September 2, 2004. We granted the United States' motion, and the court subsequently received further briefing by the intervenor, the parties, and amicus curiae.

Filed December 13, 2005

Before: Andrew J. Kleinfeld, Johnnie B. Rawlinson,
Circuit Judges, and Justin L. Quackenbush,** District Judge.

Opinion by Judge Kleinfeld

---

**The Honorable Justin L. Quackenbush, Senior United States District
Judge for the Eastern District of Washington, sitting by designation.

## COUNSEL

John Trebon, Trebon & Fine, P.C., Flagstaff, Arizona, for the appellant.

Donovan D. Brown, Sr., Acting Deputy Assistant Attorney General, Navajo Nation Office of the Attorney General, Window Rock, Arizona, for the appellees.

Thomas L. Sansonetti (briefed), Assistant Attorney General, U.S. Department of Justice, Env. & Nat. Resources Division, Washington, D.C., for the intervenor.

Jon Metropoulos (briefed), Gough, Shanahan, Johnson & Waterman, Helena, Montana, for amicus curiae Thomas Lee Morris and Elizabeth S. Morris.

## ORDER

The opinion filed August 23, 2005, and appearing at 420 F.3d 1037 (9th Cir. 2005), is withdrawn. Pursuant to General Order 5.3.a, an opinion is filed contemporaneously with this order. With the withdrawal and substitution of the opinion, the petitions for rehearing and rehearing en banc are denied as moot. Subsequent petitions for rehearing and rehearing en banc may be filed. Federal Rule of Appellate Procedure 40 now controls.

## OPINION

KLEINFELD, Circuit Judge:

This case concerns whether an Indian tribe can exercise criminal jurisdiction over a person who is not a member of the tribe, but who is an enrolled member of another Indian tribe.

### Facts

This is an appeal from a denial of a petition for a writ of habeas corpus. The petitioner, Russell Means, an enrolled member of the Oglala-Sioux Indian Tribe, seeks to prevent the Navajo Nation from criminally prosecuting him in Navajo tribal court for an incident that occurred on the Navajo Reservation.

In December 1997, Means allegedly threatened and battered his then father-in-law, who is an Omaha Indian, and allegedly threatened another man, a Navajo Indian. The offenses are misdemeanors under the Navajo Code, with potential maximum penalties of 90 days in jail and a $250 fine for each threat,[1] and 180 days in jail and a $500 fine for the battery.[2]

---

[1]*See* Navajo Nation Code tit. 17, § 310.

[2]*See* Navajo Nation Code tit. 17, § 316.

Means moved in the Navajo tribal court to dismiss the tribal proceedings. He argued that the tribal court had no jurisdiction over him because he was not a Navajo. Means testified that he is an enrolled member of the Oglala-Sioux Tribe of Indians and a permanent resident of Porcupine, a town in South Dakota on the Pine Ridge Sioux Indian Reservation. Means lived on the Navajo Indian Reservation from 1987 to 1997 when he was married to a woman who was a half-Navajo, half-Omaha Indian. Means moved back to the Sioux reservation in 1997, and the alleged offenses occurred later when Means was visiting the Navajo reservation.

Means testified that the difference between an Oglala-Sioux and a Navajo is analogous to the difference in nationalities between an American and a French person. Although Means lived on the Navajo reservation for a decade while married to his ex-wife, he could never become a member of the Navajo tribe because membership required at least one quarter Navajo blood.[3] Means does not speak Navajo, and as a non-Navajo, he had difficulty obtaining employment because of tribal preferences given to Navajos and restrictions that make it difficult for a non-Navajo to find employment, participate in civic life, and license a business.

The Navajo Nation trial court denied Means' motion to dismiss for lack of jurisdiction. Means appealed to the Navajo Nation Supreme Court which also denied his motion. The decision of the Navajo Supreme Court explains that the Navajo reservation covers about 25,000 square miles, making it larger than many U.S. states and foreign countries.[4] Over 9,000 Indians of other tribes live within the Navajo Nation, so

---

[3]Enrolled membership in the Navajo Nation is conditioned upon no less than one-fourth degree of Navajo blood. One may not become a Navajo by adoption or custom, and one cannot become a Navajo if he is an enrolled member of another Indian Nation or Tribe. *See* Navajo Nation Code tit. 1, §§ 701-703.

[4]The Navajo Reservation is almost three times the size of New Jersey.

domestic violence cases involving non-Navajo Indians arise from time to time. The Navajo Supreme Court explained that the considerable amount of violence arising from alcohol, when combined with the size and ethnic inclusiveness of the reservation, generates a "need to exercise criminal jurisdiction over all who enter the Navajo Nation," not just Navajo Indians. The Navajo Supreme Court decision says that while there are preferences for Navajos in employment and contracting, they are not absolute barriers, and that Means could have qualified for jury service in the Navajo tribal courts had he been registered to vote in Arizona. The Navajo Supreme Court also noted that, because Means had married a Navajo, he was a "hadane," or in-law, during his residence on the reservation, connected by rights and obligations to his wife's clan. As the Navajo Supreme Court notes, however, becoming a "hadane" does not make one a Navajo.

After exhausting his remedies in the Navajo courts, Means petitioned the United States District Court for a writ of habeas corpus to enjoin the tribal courts from proceeding further in his case. The district court denied Means's petition, and he appeals.

## Analysis

All the questions before us are purely matters of law and arise on appeal of the district court's denial of a writ of habeas corpus under 25 U.S.C. § 1303, so we review de novo.[5]

## I.  Jurisdiction

Means has exhausted his tribal court remedies regarding jurisdiction, but he has still not been tried for the alleged threats and battery. Nonetheless, Means remains subject to conditions of pretrial release. Means cannot have any contact

---

[5]*See McCoy v. Stewart*, 282 F.3d 626, 629 (9th Cir. 2002); *Moore v. Nelson*, 270 F.3d 789, 790-92 (9th Cir. 2001).

with his former father-in-law or go within 100 yards of his former father-in-law's home. Means also must appear as ordered by the Navajo trial court or face re-arrest and additional punishment for any failure to appear. The district court therefore concluded that Means was in custody for purposes of habeas jurisdiction under *Justices of Boston Municipal Court v. Lydon*[6] and *Hensley v. Municipal Court*.[7] The parties have not challenged that conclusion before us, and, although we are required to examine jurisdiction *sua sponte*,[8] we agree with the district court. The charges against Means remain pending in the Navajo Nation trial court, and although the Navajo Nation and Means have stipulated to a stay in the trial court until this appeal is decided, the Navajo Nation states that it fully intends to prosecute Means if jurisdiction is resolved in its favor. Accordingly, we have jurisdiction to consider this appeal.

## II.    The 1990 Amendments to the Indian Civil Rights Act

In *Oliphant v. Suquamish Indian Tribe*,[9] the Supreme Court held that Indian tribes do not possess criminal jurisdiction over non-Indians.[10] In *Oliphant*, the Suquamish Tribe had prosecuted two non-Indians, one for racing down a highway and colliding with a tribal police car, and another for assaulting an officer and resisting arrest.[11] The tribe did not claim that Congress had given it authority to exercise jurisdiction, but rather that the tribe had an inherent sovereign authority to exercise criminal jurisdiction over incidents that occurred on its reservation — an authority that Congress had never taken

---

[6]*Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 300-02 (1984).

[7]*Hensley v. Mun. Court, San Jose-Milpitas Judicial Dist., Santa Clara County*, 411 U.S. 345, 351-52 (1973).

[8]*See Bernhardt v. County of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2002).

[9]*Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978).

[10]*Id.* at 194.

[11]*Id.*

away.[12] The Supreme Court disagreed and held that, although Indian tribes enjoy some sovereign powers, their "domestic, dependent"[13] nature distinguishes them from the governments of foreign countries.[14] It also held that citizens of the United States who are not Indians cannot be subjected to Indian tribal sovereignty for criminal purposes.[15]

[1] Following *Oliphant*, the Supreme Court suggested in *United States v. Wheeler*[16] that the inherent sovereignty of a tribe might extend only to its own enrolled members.[17] Then, in *Duro v. Reina*,[18] the Court explicitly held that "the retained sovereignty of the tribe as a political and social organization to govern its own affairs does not include the authority to impose criminal sanctions against a citizen outside its own membership."[19] *Duro* reasoned that, as American citizens,[20] Indians were entitled not to be subjected to the criminal authority of sovereigns of which they were not and could not become full members.[21]

[2] In 1990 Congress responded to Indian tribes' concerns about the holding in *Duro* by amending[22] the Indian Civil Rights Act[23] to say that the "powers of self-government" of Indian tribes "means the inherent power of Indian tribes,

---

[12]*Id.* at 195-96.

[13]*See Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831).

[14]*Oliphant*, 435 U.S. at 211; *see also United States v. Kagama*, 118 U.S. 375, 379 (1886).

[15]*Oliphant*, 435 U.S. at 212.

[16]*United States v. Wheeler*, 435 U.S. 313 (1978).

[17]*Id.* at 323, 326-29.

[18]*Duro v. Reina*, 495 U.S. 676 (1990).

[19]*Id.* at 679.

[20]*See* Indian Citizenship Act of 1924, 8 U.S.C. § 1401(b).

[21]*Duro*, 495 U.S. at 692-93.

[22]*See* Pub. L. 101-511, Title VIII, § 8077(b)-(c), 104 Stat. 1892 (1990).

[23]Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301-1303.

hereby recognized and affirmed, to exercise criminal jurisdic-
tion over all Indians."²⁴ "All Indians" plainly includes Indians
who are not enrolled members of the particular tribe exercis-
ing jurisdiction. It is significant for the equal protection dis-
cussion below, however, that the 1990 Amendments do not
cover all persons who may be ethnically Indian. In addition
to extending tribal criminal jurisdiction to "all" Indians, the
1990 Amendments make it plain that the definition of "Indi-
an" is the same as "Indian" in the Major Crimes Act.²⁵

The 1990 Amendments define "Indian" as "any person who
would be subject to the jurisdiction of the United States as an
Indian under section 1153, Title 18, if that person were to
commit an offense listed in that section in Indian country to
which that section applies."²⁶ The statute referred to, 18
U.S.C. § 1153 (the Major Crimes Act), says it applies to
"[a]ny Indian."²⁷ In *United States v. Antelope,*²⁸ enrolled Indi-
ans prosecuted under the Major Crimes Act argued that they
were denied equal protection of the laws, because, had they
not been Indians, they would have been prosecuted under
more favorable state law. The Court described the federal
scheme as one in which "[e]xcept for the offenses enumerated
in the Major Crimes Act, all crimes committed by enrolled
Indians against other Indians within Indian country are subject
to the jurisdiction of tribal courts." The Court rejected the
Equal Protection challenge because "respondents were not
subjected to federal criminal jurisdiction because they were of
the Indian race but because they were enrolled members of
the Coeur d'Alene Tribe."²⁹ The Court pointed out that "fed-
eral jurisdiction under the Major Crimes Act does not apply

---

²⁴25 U.S.C. § 1301(2).

²⁵18 U.S.C. § 1153.

²⁶25 U.S.C. § 1301(4).

²⁷*See* 18 U.S.C. § 1153(a).

²⁸*United States v. Antelope*, 430 U.S. 641 (1977).

²⁹*Id.* At 646.

to 'many individuals who are racially to be classified as "Indians." ' "³⁰ The Court noted in dictum that lower courts had held that enrollment was not an "absolute" requirement for federal jurisdiction in some circumstances, but because respondents were enrolled, the Court was "not called upon to decide" whether enrollment was an absolute requirement and "therefore intimate[d] no views on the matter."³¹

**[3]** Taken together, the 1990 Amendments, the Major Crimes Act, and *Antelope* mean that the criminal jurisdiction of tribes over "all Indians" recognized by the 1990 Amendments means all of Indian ancestry who are also Indians by political affiliation, not all who are racially Indians. For that reason, subjecting Means to tribal court jurisdiction but not non-Indians, is, as we explain further below, not a racial classification.

Means argues that the 1990 Amendments were outside the powers of Congress because they were an unconstitutional delegation of federal governmental authority and because they went beyond the congressional power authorized under the Indian Commerce³² and Treaty³³ Clauses. Indian tribes are not bound by the United States Constitution in the exercise of their powers, including their judicial powers,³⁴ so federal judicial power over nonmembers could not be delegated to them.³⁵

Following the 1990 Amendments, Means's theory was tested in other cases. Double jeopardy cases examined whether the statutory language, "recogniz[ing] and affirm[ing]" the power of tribes over nonmember Indians rather than

---

³⁰*Id.* at 646 n.7 (quoting *Morton v. Mancari*, 417 U.S. 535, 553 n.24 (1974)).

³¹*Id.* At 646-47, n. 7.

³²U.S. Const. art. I, § 8, cl. 3.

³³U.S. Const. art. II, § 2, cl. 2.

³⁴*See Talton v. Mayes*, 163 U.S. 376, 382-85 (1896).

³⁵*See Duro*, 495 U.S. at 686.

"delegating" it, avoided double jeopardy problems when both a tribe and the federal government punished someone for the same conduct. If the tribe was exercising its inherent sovereign authority, an Indian defendant could be punished in both the tribal court as well as in federal district court under the "dual sovereignty" doctrine.[36] If the tribe was exercising delegated federal power, then the federal government would be punishing the Indian twice for the same conduct, which it could not do under the double jeopardy clause.[37] More broadly, after the Supreme Court in *Duro* had concluded that the tribe had not retained sovereign power over nonmember Indians,[38] the question was whether Congress even had the ability to "recognize" an inherent power.[39]

**[4]** These questions raised by Means's statutory argument[40] have, subsequent to the original briefing in this case, been definitively answered by the Supreme Court. *United States v. Lara*[41] holds that "Congress does possess the constitutional power to lift the restrictions on the tribes' criminal jurisdiction over nonmember Indians as the statute seeks to do."[42] As for whether the tribe's exercise of criminal jurisdiction was a delegated power or an inherent sovereign power, the Court held, with certain reservations, that "the Constitution permits tribes, as an exercise of their inherent tribal authority, to prosecute nonmember Indians."[43] Thus, except for the questions

---

[36]*See, e.g.*, *United States v. Lara*, 324 F.3d 635, 636 (8th Cir. 2003) (en banc), *rev'd*, 541 U.S. 193 (2004); *United States v. Enas*, 255 F.3d 662, 675 (9th Cir. 2001) (en banc).

[37]*See Enas*, 255 F.3d at 667.

[38]*See Duro*, 495 U.S. at 679.

[39]*See Enas*, 255 F.3d at 667-75.

[40]*Cf. Enas*, 255 F.3d at 665; *Means v. N. Cheyenne Tribal Court*, 154 F.3d 941, 942 (9th Cir. 1998), *overruled in part*, *Enas*, 255 F.3d at 675 n.8.

[41]*United States v. Lara*, 541 U.S. 193 (2004).

[42]*Id.* at 200.

[43]*Id.* at 210.

reserved in *Lara*,[44] it is settled law that, pursuant to the 1990 amendment to the Indian Civil Rights Act, an Indian tribe may exercise inherent sovereign judicial power in criminal cases against nonmember Indians for crimes committed on the tribe's reservation.

## III.   Equal Protection and Due Process

### A.   Equal Protection

*Lara* expressly declined to answer the question of whether the tribal criminal prosecution of a nonmember Indian would violate the Due Process and Equal Protection guarantees of the Fifth Amendment.[45] Means argues that by recognizing tribal criminal jurisdiction over nonmember Indians, the 1990 Amendments violate the equal protection guarantees of the Fifth Amendment[46] and the Indian Civil Rights Act[47] because they discriminate against him as an Indian, subjecting him to adverse treatment on account of his race.

Means's equal protection argument has real force. He argues that, although the 1990 Amendments permit the Navajo tribe to criminally prosecute its own members and members of other Indian tribes, the Navajo tribe cannot constitutionally prosecute whites, blacks, Asians, or any other non-Navajos who are accused of crimes on the reservation.[48] This makes Means's case different from, say, an Alaskan who threatens and batters his father-in-law in Los Angeles, and then is prosecuted by the State of California. Not only can an Alaskan become a Californian, but the State of California, although "sovereign," nonetheless is bound by the Due Pro-

---

[44]*See id.* at 207-09 (declining to address equal protection and due process challenges to the Indian Civil Rights Act).

[45]*See id.* at 208-09; *see also id.* at 213-14 (Kennedy, J., concurring).

[46]*See* U.S. Const. amend. V.

[47]*See* 25 U.S.C. § 1302(8).

[48]*See Oliphant*, 435 U.S. at 194.

cess and Equal Protection Clauses of the Fourteenth Amendment. Although he is an Indian, Means is nonetheless a citizen of the United States, entitled to the full protection of the United States Constitution. But unlike states, when Indian tribes exercise their sovereign authority they do not have to comply with the United States Constitution.[49] As an Oglala-Sioux, Means can never become a member of the Navajo political community, no matter how long he makes the Navajo reservation his home.

[5] Despite the force of Means's argument, we nonetheless conclude that the weight of established law requires us to reject Means's equal protection claim. *Morton v. Mancari*[50] holds (albeit in the distinguishable context of Indian employment preferences by the federal government) that federal statutory recognition of Indian status is "political rather than racial in nature."[51] Means argues that *Mancari* is undermined by *Adarand Constructors, Inc. v. Pena*,[52] but both the Supreme Court and our court have continued to rely on *Mancari*,[53] and we are bound to follow it under the doctrine of *Agostini v. Felton*.[54]

---

[49]*See Talton*, 163 U.S. at 382-85; *Trans-Canada Enterprises, Ltd. v. Muckleshoot Indian Tribe*, 634 F.2d 474, 476-77 (9th Cir. 1980). Although the Indian Civil Rights Act imposes due process limitations upon Indian tribes, 25 U.S.C. § 1302(8), not all the constitutional restraints are imposed. They are statutory, not constitutional, and the sole remedy for violations is habeas corpus. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56-57 (1978).

[50]*Morton v. Mancari*, 417 U.S. 535 (1974).

[51]*Id.* at 553 n.24.

[52]*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995); *see also Johnson v. California*, 543 U.S. 499, 125 S.Ct. 1141, 1147-48 (2005).

[53]*See Rice v. Cayetano*, 528 U.S. 495, 518-22 (2000); *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1279 (9th Cir. 2004).

[54]*Agostini v. Felton*, 521 U.S. 203, 237 (1997); *see also United States v. Hatter*, 532 U.S. 557, 567 (2001); *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997); *Rodrigues de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

*Mancari* held that an employment preference for Indians in the Bureau of Indian Affairs was not "invidious racial discrimination in violation of the Due Process Clause of the Fifth Amendment"[55] because "it is not even a 'racial' preference."[56] "[L]egislation that singles out Indians for particular and special treatment" is in a special category because of the historical relationship of the United States with the Indians and the Indian Commerce Clause,[57] and "[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed."[58] The preference at issue passed this "rational tie" standard, because it was "reasonable and rationally designed to further Indian self-government."[59]

[6] We conclude that a law subjecting nonmember Indians to tribal criminal jurisdiction in "Indian country" passes the "rational tie" standard of *Mancari*. First, recognizing criminal jurisdiction of tribal courts over nonmember Indians furthers Indian self-government. The Navajo reservation, larger than many states and countries, has to be able to maintain order within its boundaries. The 1990 Amendments to the Indian Civil Rights Act were meant to protect Indians and others who reside in or visit Indian country against lawlessness by nonmember Indians who might not otherwise be subject to any criminal jurisdiction. As the Navajo Supreme Court notes, there are a significant number of Indians who are not Navajos but live on the Navajo reservation because of intermarriage. It is a matter of ordinary experience that many people are not at their best when their marriages break up, so misdemeanor jurisdiction over nonmember Indians is rationally related to Indian self-government in an area where rapid and effective

---

[55]*Mancari*, 417 U.S. at 551.

[56]*Id.* at 553.

[57]*See id.* at 551-55.

[58]*Id.* at 555.

[59]*Id.*

tribal responses may be needed. The Navajo Nation has a sophisticated body of published laws, and an experienced court system in which trained trial and appellate judges adjudicate thousands of cases per year. If Means was not subject to prosecution in the Navajo courts, he could not be prosecuted in any court. The state of Arizona, like the majority of states, does not have jurisdiction to try Indians for offenses committed on a reservation,[60] and there is no federal court jurisdiction because Means's alleged offenses do not fall within the Major Crimes Act.[61]

[7] Second, the reason Congress can recognize the power of a tribe to exercise criminal jurisdiction over a nonmember Indian like Means — but not over a nonmember, non-Indian who like Means might become involved in a domestic dispute — is the same reason given by the Supreme Court for the employment preference in *Mancari*: Indian tribal identity is political rather than racial, and the only Indians subjected to tribal court jurisdiction are enrolled or *de facto* members of tribes, not all ethnic Indians.

In *United States v. Antelope*, Indians who were enrolled members of the Coeur d'Alene Tribe challenged the applicability of federal law to a prosecution for a murder that had taken place on the tribe's reservation.[62] Had they been of a different race, they argued, a more favorable provision of state law would have applied under the Assimilative Crimes Act,[63] rather than the less favorable federal provision that applied under the Major Crimes Act.[64] But the Supreme Court noted its holding in *Mancari* that the employment preference

---

[60]*See, e.g.*, *Application of Denetclaw*, 320 P.2d 697, 698-701 (Ariz. 1958).

[61]*See* 18 U.S.C. § 1153.

[62]*Antelope*, 430 U.S. at 642-44.

[63]18 U.S.C. § 13; *see United States v. McBratney*, 104 U.S. 621, 621-24 (1881).

[64]18 U.S.C. § 1153.

was granted to Indians "not as a discrete racial group, but rather, as members of quasi-sovereign political entities,"[65] and extended *Mancari* even though the context did not involve Indian self-government. The Court found that the respondents were subjected to federal law "not because they are of the Indian race but because they are enrolled members of the Coeur d'Alene tribe."[66]

There is no sound distinction in principle between *Antelope* and this case. The statute subjects Means to Navajo criminal jurisdiction not because of his race but because of his political status as an enrolled member of a different Indian tribe.[67] We need not decide whether the same principle would apply if he had been expelled from or had voluntarily and formally withdrawn from his tribe[68] prior to committing the alleged misdemeanors because those hypothetical facts are not claimed in this case. *Morton v. Mancari* suggests that Indians "emancipated from tribal relations" or whose tribes have been terminated are not subject to the Major Crimes Act even if they are "racially to be classified as 'Indians.' "[69]

Our court is among the lower courts that have gone where the Supreme Court did not in *Antelope*, holding that formal

---

[65]*Antelope*, 430 U.S. at 645 (quoting *Mancari*, 417 U.S. at 554).

[66]*Antelope*, 430 U.S. at 646.

[67]25 U.S.C. § 1301(2); *see Antelope*, 430 U.S. at 646.

[68]The authorities suggest that members of Indian tribes can renounce their membership. *See Felix S. Cohen's Handbook of Federal Indian Law* 22 (1982 ed.) ("Tribal membership is a bilateral relation, depending for its existence not only upon the action of the tribe but also upon the action of the individual concerned. A member of any Indian tribe is at liberty to terminate the tribal relationship whenever he or she so chooses, although such termination will not lightly be inferred."); *see, e.g.*, *Smith v. Bonifer*, 154 F. 883, 886 (C.C.D. Or. 1907) (No. 2,683), *aff'd*, 116 F. 846 (9th Cir. 1909); *United States ex rel. Standing Bear v. Crook*, 25 F. Cas. 695, 699 (C.C.D. Neb. 1879) (No. 14,891); *Thompson v. County of Franklin*, 180 F.R.D. 216, 225 (N.D.N.Y. 1998).

[69]*Morton*, 430 U.S. at 646-47, n. 7.

enrollment in a tribe is not an "absolute" requirement for Indian status even though it is the "common evidentiary means of establishing Indian status."[70] *United States v. Bruce*[71] was a federal prosecution under 25 U.S.C. § 1152 (the Indian General Crimes Act) for assault on a child on an Indian reservation. The defendant in *Bruce* argued that she was an Indian, so she was entitled to the benefit of the exception in that statute for crimes committed by an Indian against an Indian. She was not enrolled in any tribe nor was she eligible for enrollment. We held (over a strong dissent) that she was nevertheless entitled to the benefit of the Indian exception because her mother's enrollment, two of her three children's enrollment, and other evidence of affiliation with the tribe demonstrated " 'a sufficient non-racial link to a formerly sovereign people' "[72] to make her an "Indian" for purposes of the exception

Means's case is distinguishable from *Bruce*, most especially by his tribal enrollment. We therefore can and do leave for another day the challenging question *Bruce* invites: whether a person who was racially Indian, but who was not enrolled or eligible for enrollment in any tribe, would be subject to tribal court jurisdiction. While *Bruce* was a federal prosecution which would have implicitly limited tribal sovereignty if the Indian exception did not apply, this case is a tribal court prosecution. Means has chosen to affiliate himself politically as an Indian by maintaining enrollment in a tribe. His Indian status is therefore political, not merely racial. *Bruce* concluded, as we do, that "Tribal courts may . . . prosecute misdemeanors against Indians who are not members of that tribe."[73]

---

[70]*United States v. Bruce*, 394 F.3d 1215, 1224. (9th Cir. 2005).

[71]*Id.*

[72]*Id.* At 1224 (quoting *St. Cloud v. United States*, 702 F.Supp. 1456, 1461 (D.S.D. 1988)).

[73]*Id.* At 1220.

## B.  Due Process

**[8]** Because the criminal proceedings against Means in the Navajo trial court have been stayed pending the outcome of his jurisdictional challenge, an "as applied" due process challenge to the Navajo trial proceedings would be premature.[74] Means's facial due process challenge to the 1990 Amendments has no force. Although the U.S. Constitution does not bind the Navajo tribe in the exercise of its own sovereign powers,[75] the Indian Civil Rights Act confers all the criminal protections on Means that he would receive under the Federal Constitution, except for the right to grand jury indictment and the right to appointed counsel if he cannot afford an attorney.[76] The right to grand jury indictment would not pertain regardless, because Means is charged with a misdemeanor.[77] The right to appointed counsel is conferred by the Navajo Bill of Rights to any person within its jurisdiction.[78] Thus as a facial matter, Means will not be deprived of any constitutionally protected rights despite being tried by a sovereign not bound by the Constitution.

## IV.  The Treaty of 1868

The war between the United States and the Navajo Nation, which began in the middle of the U.S. Civil War, ended in 1868 with a treaty[79] signed on behalf of the United States by General William Tecumseh Sherman. Means argues that, under the terms of this treaty, he may not be criminally prose-

---

[74]*See Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973).

[75]*See  Talton*, 163 U.S. at 382-85.

[76]*See* 25 U.S.C. § 1302; *Santa Clara Pueblo*, 436 U.S. at 61; *Randall v. Yakima Nation Tribal Court*, 841 F.2d 897, 899-900 (9th Cir. 1988).

[77]*See* U.S. Const. amend. V; *cf.* Fed. R. Crim. P. 7(a)(2).

[78]*See* Navajo Nation Code tit. 1.

[79]Treaty between the United States of America and the Navajo Tribe of Indians, June 1, 1868, U.S.-Navajo, 15 Stat. 667.

cuted by the Navajo tribe but must be turned over to the federal government for trial.

Means bases his argument on the so-called "bad men" clauses of the 1868 Treaty. Indian tribes warred, not only with the federal government, but also with other tribes. Guaranteeing that the Indians would return to a peaceful way of life, therefore, required some means of dealing with the hostile foreign tribes.

One clause in the 1868 Navajo Treaty — which is identical to language used in a number of Indian Treaties of the time — says that

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States.[80]

A second clause, speaking expressly about Indians, is analogous:

> If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States and at peace therewith, the Navajo tribe agree that they will, on proof made to their agent, and on notice by him, deliver up the wrongdoer to the United States, to be tried and punished according to its laws.[81]

---

[80]*Id.*

[81]*Id.*

Means argues that even if the Navajo Nation at one time possessed the sovereign power to assert criminal jurisdiction over nonmember Indians, it relinquished that right by entering into the 1868 Treaty, which requires that the Navajo Tribe deliver the wrongdoer to the United States, to be tried and punished according to federal, not Indian, law. Means also argues that the 1990 Amendments to the Indian Civil Rights Act cannot abrogate the protections to which he is entitled under the 1868 Treaty because Congress has never expressly abrogated the treaty.

The Navajo Nation, however, argues that a discussion between General Sherman and the Navajo Chief Barboncito during the treaty negotiations expresses an understanding that the Navajo were entitled to "drive out" raiders from the Ute and Apache tribes who might molest them, and that the Indian "bad men" clause therefore meant to confer jurisdiction over nonmember Indians, not to remove it. The Navajo Nation also suggests that we are bound to defer to the understanding of the treaty expressed well over a century after its adoption by the Navajo Nation Supreme Court. That court found that the 1868 Treaty provides for criminal jurisdiction over Means because he entered the Navajo Nation, married a Navajo woman, and engaged in business and civic activities while residing on the reservation.

[9] We accept neither argument because the 1868 Treaty does not conflict with, and is easily reconciled with, the language of the 1990 Amendments to the Indian Civil Rights Act that recognizes the inherent sovereign power of the tribe. A common sense understanding of the treaty language would be that the United States was obligating itself to protect the Navajos from "bad men," of whom the world is never short, and the Navajos were obligating themselves to turn the "bad men" over to the United States when appropriate under the specified conditions.[82] The treaty obligates the United States

---

[82]*Cf. Tsosie v. United States*, 825 F.2d 393, 400-02 (Fed. Cir. 1987); *Hebah v. United States*, 428 F.2d 1334, 1338-40 (Ct. Cl. 1970).

to arrest and punish offenders against the Navajo, under federal law, but it does not say that the Navajo cannot do so on their own, and there is nothing in the treaty language inconsistent with the concurrent jurisdiction that we have recognized in other contexts.[83]

**[10]** The remedies provided for by the 1868 treaty do not purport to be exclusive. Under the treaty, Indian offenders are to be delivered to the United States for prosecution under federal law on request. This provision, however, is conditioned on a request from the United States's agent. The treaty conditions have not been fulfilled in this case, so the rendition provision in the treaty does not apply. The United States has not demanded that the Navajo turn Means over for federal prosecution, and the Navajo have chosen to prosecute Means themselves in tribal court, which the 1990 Amendments to the Indian Civil Rights Act recognize they have the power to do.

## Conclusion

**[11]** The Navajo Nation is empowered, under the 1990 Amendments, to prosecute and punish Indians for crimes even though they are not members of the tribe. The denial of Means's petition for a writ of habeas corpus is

**AFFIRMED**.

---

[83]*See Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587, 595-98 (9th Cir. 1983); *Arizona ex rel. Merrill v. Turtle*, 413 F.2d 683, 685-86 (9th Cir. 1969); *see also Williams v. Lee*, 358 U.S. 217, 221-22 (1959).