Justice BREYER
delivered the opinion of the Court.
| ^This case concerns a congressional statute “recogniz[ing] and affirm[ing]” the “inherent” authority of a tribe to bring a criminal misdemeanor prosecution against an Indian who is not a member of that tribe—authority that this Court previously held a tribe did not possess. Compare 25 U.S.C. § 1301(2) with Duro v. Reina, 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990). We must decide whether Congress has the constitutional power to relax restrictions that the political branches have, over time, placed on the exercise of a tribe’s inherent legal authority. We conclude that Congress does possess this power.
I
Respondent Billy Jo Lara is an enrolled member of the Turtle Mountain Band of Chippewa Indians in north-central North Dakota. He married a member of a different tribe, the Spirit Lake Tribe, and lived with his wife and children on the Spirit Lake Reservation, also located in North Dakota. See Brief for Spirit Lake Sioux Tribe of North Dakota et al. as Amici Curiae 4-5. After several incidents of serious misconduct, the Spirit Lake Tribe issued an order excluding him from the reservation. Lara ignored the order; federal officers stopped him; and he struck one of the arresting officers. 324 F.3d 635, 636 (C.A.8 2003) (en banc).
The Spirit Lake Tribe subsequently prosecuted Lara in the Spirit Lake Tribal Court for “violence to a policeman.” Ibid. Lara pleaded guilty and, in respect to that crime, served 90 days in jail. See ibid.; Tr. of Oral Arg. 28.
|137After Lara’s tribal conviction, the Federal Government charged Lara in the Federal District Court for the District of North Dakota with the federal crime of assaulting a federal officer. 324 F.3d, at 636; 18 U.S.C. § 111(a)(1). Key elements of this federal crime mirror elements of the tribal crime of “violence to a policeman.” See Brief for United States 7. And this similarity between the two crimes would ordinarily have brought Lara within the protective reach of the Double Jeopardy Clause. U.S. Const., Amdt. 5 (the Government may not “subject” any person “for the same offence to be twice put in jeopardy of life or limb”); 324 F.3d, at 636. But the Government, responding to Lara’s claim of double jeopardy, pointed out that the Double Jeopardy Clause does not bar successive prosecutions brought by separate sovereigns, and it argued that this “dual sovereignty” doctrine determined the outcome here. See Heath v. Alabama, 474 U.S. 82, 88, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) (the Double Jeopardy Clause reflects the “common-law7 conception of crime as an offense against the sovereignty of the government”; when “a defendant in a single act violates the ‘peace and dignity of two sovereigns by breaking the laws of each, he has committed two distinct ‘offences’ ”).
*1632 The Government noted that this Court has held that an Indian tribe acts as a separate sovereign when it prosecutes its own members. United States v. Wheeler, 435 U.S. 313, 318, 322-323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (a tribe’s “sovereign power to punish tribal offenders,” while subject to congressional “defeasance,” remains among those “ ‘inherent powers of a limited sovereignty which has never been extinguished’ ” (emphasis added and deleted)). The Government recognized, of course, that Lara is not one of the Spirit Lake Tribe’s own members; it also recognized that, in Duro v. Reina, supra, this Court had held that a tribe no longer possessed inherent or sovereign authority to prosecute a “nonmember Indian.” Id., at 682, 110 S.Ct. 2053. But it pointed out that, soon after this Court decided Dwro, Congress enacted new legislation specifically | ^authorizing a tribe to prosecute Indian members of a different tribe. See Act of Nov. 5, 1990, §§ 8077(b)-(d), 104 Stat. 1892-1893 (temporary legislation until September 30, 1991); Act of Oct. 28, 1991, 105 Stat. 646 (permanent legislation). That new statute, in permitting a tribe to bring certain tribal prosecutions against nonmember Indians, does not purport to delegate the Federal Government’s own federal power. Rather, it enlarges the tribes’ own “ ‘powers of self-government’ ” to include “the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians,” including nonmembers. 25 U.S.C. § 1301(2) (emphasis added).
In the Government’s view, given this statute, the Tribe, in prosecuting Lara, had exercised its own inherent tribal authority, not delegated federal authority; hence the “dual sovereignty” doctrine applies, Heath, supra, at 88, 106 S.Ct. 433; and since the two prosecutions were brought by two different sovereigns, the second, federal, prosecution does not violate the Double Jeopardy Clause.
The Federal Magistrate Judge accepted the Government’s argument and rejected Lara’s double jeopardy claim. 324 F.3d, at 636-637. An Eighth Circuit panel agreed with the Magistrate Judge. 294 F.3d 1004 (2002). But the en banc Court of Appeals, by a vote of 7 to 4, reached a different conclusion. 324 F.3d 635 (2003). It held the Tribal Court, in prosecuting Lara, was exercising a federal prosecutorial power; hence the “dual sovereignty” doctrine does not apply; and the Double Jeopardy Clause bars the second prosecution. Id., at 640. The four dissenting judges, agreeing with the Federal Government, concluded that the Tribal Court had exercised inherent tribal power in prosecuting Lara; hence the “dual sovereignty” doctrine applies and allows the second, federal, prosecution. Id., at 641 (opinion of M. Arnold, J-).
Because the Eighth Circuit and Ninth Circuit have reached different conclusions about the new statute, we | ^granted cer-tiorari. Cf. United States v. Enas, 255 F.3d 662 (C.A.9 2001) (en banc), cert. denied, 534 U.S. 1115, 122 S.Ct. 925, 151 L.Ed.2d 888 (2002). We now reverse the Eighth Circuit.
II
We assume, as do the parties, that Lara’s double jeopardy claim turns on the answer to the “dual sovereignty” question. What is “the source of [the] power to punish” nonmember Indian offenders, “inherent tribal sovereignty” or delegated federal authority? Wheeler, supra, at 322, 98 S.Ct. 1079 (emphasis added).
We also believe that Congress intended the former answer. The statute says that it “recognize[s] and affirmfs]” in each tribe the “inherent” tribal power (not delegated federal power) to prosecute nonmember Indians for misdemeanors. See supra, at *1633 1632; Appendix, infra (emphasis added). And the statute’s legislative history confirms that such was Congress’ intent. See, e.g., H.R. Conf. Rep. No. 102-261, pp. 3-4 (1991), U.S.Code Cong. & Admin.News 1991, pp. 370, 379-80 (“The Committee of the Conference notes that ... this legislation is not a delegation of this jurisdiction but a clarification of the status of tribes as domestic dependent nations”); accord, H.R.Rep. No. 102-61, p. 7 (1991), U.S.Code Cong. & Admin.News 1991, pp. 370, 376-77; see also S.Rep. No. 102-168, p. 4 (1991) (“reeognizfjng] and reaffirmfing] the inherent authority of tribal governments to exercise criminal jurisdiction over all Indians”); 137 Cong. Rec. 9446 (1991) (remarks of Sen. Inouye) (the “premise [of the legislation] is that the Congress affirms the inherent jurisdiction of tribal governments over nonmember Indians” (emphasis added)); id., at 10712-10714 (remarks of Rep. Miller, House manager of the bill) (the statute “is not a delegation of authority but an affirmation that tribes retain all rights not expressly taken away” and the bill “recognizes an inherent tribal right which always existed”); id., at 10713 (remarks of Rep. Richardson, a sponsor of the amendment) (the legislation “reaffirms” tribes’ power).
lanpThus the statute seeks to adjust the tribes’ status. It relaxes the restrictions, recognized in Duro, that the political branches had imposed on the tribes’ exercise of inherent prosecutorial power. The question before us is whether the Constitution authorizes Congress to do so. Several considerations lead us to the conclusion that Congress does possess the constitutional power to lift the restrictions on the tribes’ criminal jurisdiction over nonmember Indians as the statute seeks to do.
First, the Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as “plenary and exclusive.” E.g., Washington v. Confederated Bands and Tribes of Yakima Nation, 439 U.S. 463, 470-471, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979); Negonsott v. Samuels, 507 U.S. 99, 103, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993); see Wheeler, 435 U.S., at 323, 98 S.Ct. 1079; see also W. Canby, American Indian Law 2 (3d ed.1998) (hereinafter Canby) (“[T]he independence of the tribes is subject to exceptionally great powers of Congress to regulate and modify the status of the tribes”).
This Court has traditionally identified the Indian Commerce Clause, U.S. Const., Art. I, § 8, cl. 3, and the Treaty Clause, Ait. II, § 2, cl. 2, as sources of that power. E.g., Morton v. Mancari, 417 U.S. 535, 552, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); McClanahan v. Arizona Tax Comm’n, 411 U.S. 164, 172, n. 7, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); see also Canby 11-12; F. Cohen, Handbook of Federal Indian Law 209-210 (1982 ed.) (hereinafter Cohen) (also mentioning, inter alia, the Property Clause). The “central function of the Indian Commerce Clause,” we have said, “is to provide Congress with plenary power to legislate in the field of Indian affairs.” Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 192, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989); see also, e.g., Ramah Navajo School Bd., Inc. v. Bureau of Revenue of N. M., 458 U.S. 832, 837, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982) (“broad power” under the Indian Commerce Clause); White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) (same, and citing Wheeler, supra, at 322-323, 98 S.Ct. 1079).
laoiThe treaty power does not literally authorize Congress to act legislatively, for it is an Article II power authorizing the President, not Congress, “to make Treaties.” U.S. Const., Art. II, § 2, cl. 2. But, *1634 as Justice Holmes pointed out, treaties made pursuant to that power can authorize Congress to deal with “matters” with which otherwise “Congress could not deal.” Missouri v. Holland, 252 U.S. 416, 433, 40 S.Ct. 382, 64 L.Ed. 641 (1920); see also L. Henkin, Foreign Affairs and the U.S. Constitution 72 (2d ed.1996). And for much of the Nation’s history, treaties, and legislation made pursuant to those treaties, governed relations between the Federal Government and the Indian tribes. See, e.g., Cohen 109-111; F. Prucha, American Indian Policy in the Formative Years 44-49 (1962).
We recognize that in 1871 Congress ended the practice of entering into treaties with the Indian tribes. 25 U.S.C. § 71 (stating that tribes are not entities “with whom the United States may contract by treaty”). But the statute saved existing treaties from being “invalidated or impaired,” ibid., and this Court has explicitly stated that the statute “in no way affected Congress’ plenary powers to legislate on problems of Indians,” Antoine v. Washington, 420 U.S. 194, 203, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975) (emphasis deleted).
Moreover, “at least during the first century of America’s national existence ... Indian affairs were more an aspect of military and foreign policy than a subject of domestic or municipal law.” Cohen 208 (footnotes omitted). Insofar as that is so, Congress’ legislative authority would rest in part, not upon “affirmative grants of the Constitution,” but upon the Constitution’s adoption of preconstitutional powers necessarily inherent in any Federal Government, namely, powers that this Court has described as “necessary concomitants of nationality.” United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 315—322, 57 S.Ct. 216, 81 L.Ed. 255 (1936); Henkin, supra., at 14-22, 63-72; cf. 2 J. Continental Cong. 174-175 (1775) (W. Ford ed.1905) (creating departments of Indian affairs, appointing Indian commissioners, and noting the great importance of “s<|eur~ ing202 and preserving the friendship of the Indian Nations”); Worcester v. Georgia, 6 Pet. 515, 557, 8 L.Ed. 483 (1832) (“The treaties and laws of the United States contemplate ... that all intercourse with [Indians] shall be carried on exclusively by the government of the union”).
Second, Congress, with this Court’s approval, has interpreted the Constitution’s “plenary” grants of power as authorizing it to enact legislation that both restricts and, in turn, relaxes those restrictions on tribal sovereign authority. From the Nation’s beginning Congress’ need for such legislative power would have seemed obvious. After all, the Government’s Indian policies, applicable to numerous tribes with diverse cultures, affecting billions of acres of land, of necessity would fluctuate dramatically as the needs of the Nation and those of the tribes changed over time. See, e.g., Cohen 48. And Congress has in fact authorized at different times very different Indian policies (some with beneficial results but many with tragic consequences). Congressional policy, for example, initially favored “Indian removal,” then “assimilation” and the breakup of tribal lands, then protection of the tribal land base (interrupted by a movement toward greater state involvement and “termination” of recognized tribes); and it now seeks greater tribal autonomy within the framework of a “government-to-government relationship” with federal agencies. 59 Fed.Reg. 22951 (1994); see also 19 Weekly Comp, of Pres. Doc. 98 (1983) (President Reagan reaffirming the rejection of termination as a policy and announcing the goal of decreasing tribal dependence on the Federal Government); see 25 U.S.C. § 450a(b) (congressional commitment to “the development of strong and stable tribal governments”). See generally, Cohen 78-202 *1635 (describing this history); Canby 13-32 (same).
Such major policy changes inevitably involve major changes in the metes and bounds of tribal sovereignty. The 1871 statute, for example, changed the status of an Indian tribe from a “powe[r] ... capable of making treaties” to a | 2ft3“power with whom the United States may [not] contract by treaty.” Compare Worcester, supra, at 559, with 25 U.S.C. § 71.
One can readily find examples in congressional decisions to recognize, or to terminate, the existence of individual tribes. See United States v. Holliday, 3 Wall. 407, 419, 18 L.Ed. 182 (1866) (“If by [the political branches] those Indians are recognized as a tribe, this court must do the same”); Menominee Tribe v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968) (examining the rights of Menominee Indians following the termination of their Tribe). Indeed, Congress has restored previously extinguished tribal status—by re-recognizing a Tribe whose tribal existence it previously had terminated. 25 U.S.C. §§ 903-903Í (restoring the Menominee Tribe); cf. United States v. Long, 324 F.3d 475 (CA7) (upholding against double jeopardy challenge successive prosecutions by the restored Menominee Tribe and the Federal Government), cert. denied, 540 U.S. 822, 124 S.Ct. 151, 157 L.Ed.2d 42 (2003). Congress has advanced policies of integration by conferring United States citizenship upon all Indians. 8 U.S.C. § 1401(b). Congress has also granted ti'ibes greater autonomy in them inherent law enforcement authority (in respect to tribal members) by increasing the maximum criminal penalties tribal courts may impose. § 4217, 100 Stat. 3207-146, codified at 25 U.S.C. § 1302(7) (raising the maximum from “a term of six months and a fine of $500” to “a term of one year and a fine of $5,000”).
Third, Congress’ statutory goal—to modify the degree of autonomy enjoyed by a dependent sovereign that is not a State—is not an unusual legislative objective. The political branches, drawing upon analogous constitutional authority, have made adjustments to the autonomous status of other such dependent entities— sometimes making far more radical adjustments than those at issue here. See, e.g., Hawaii—Hawaii v. Mankichi, 190 U.S. 197, 209-211, 23 S.Ct. 787, 47 L.Ed. 1016 (1903) (describing annexation of Hawaii by joint resolution of Congress and the maintenance of a “Republic of Hawaii” until formal incorj3o^ation204 by Congress); Northern Mariana Islands—note following 48 U.S.C. § 1801 (“in accordance with the [United Nations] trusteeship agreement ... [establishing] a self-governing commonwealth ... in political union with and under the sovereignty of the United States”); the Philippines—22 U.S.C. § 1394 (congressional authorization for the President to “withdraw and surrender all right of ... sovereignty” and to “recognize the independence of the Philippine Islands as a separate and self-governing nation”); Presidential Proclamation No. 2695, 60 Stat. 1352 (so proclaiming); Puerto Rico— Act of July 3, 1950, 64 Stat. 319 (“[T]his Act is now adopted in the nature of a compact so that people of Puerto Rico may organize a government pursuant to a constitution of their own adoption”); P.R. Const., Art. I, § 1 (“Estado Libre Asocia-do de Puerto Rico”); see also Cordova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank N. A., 649 F.2d 36, 39-41 (C.A.1 1981) (describing various adjustments to Puerto Rican autonomy through congressional legislation since 1898).
Fourth, Lara points to no explicit language in the Constitution suggesting a limitation on Congress’ institutional authority to relax restrictions on tribal sovereignty *1636 previously imposed by the political branches. But cf. Part III, infra.
Fifth, the change at issue here is a limited one. It concerns a power similar in some respects to the power to prosecute a tribe’s own members—a power that this Court has called “inherent.” Wheeler, 435 U.S., at 322-323, 98 S.Ct. 1079. In large part it concerns a tribe’s authority to control events that occur upon the tribe’s own land. See United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975) (“Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory” (emphasis added)); see also, e.g., S.Rep. No. 102-168, at 21 (remarks of P. Hugent). And the tribes’ possession of this additional criminal jurisdiction is consistent with our traditional understanding of the tribes’ status as “domestic dependent nations.” Cherokee Nation v. Georgia, 5 Pet. 1, 17, 8 L.Ed. 25 (1831); see also id., at 16 (describing tribe as “a distinct political society, separated from others, capable of managing its own affairs and governing itself’). Consequently, we are not now faced with a question dealing with potential constitutional limits on congressional efforts to legislate far more radical changes in tribal status. In particular, this case involves no interference with the power or authority of any State. Nor do we now consider the question whether the Constitution’s Due Process or Equal Protection Clauses prohibit tribes from prosecuting a nonmember citizen of the United States. See Part III, infra.
Sixth, our conclusion that Congress has the power to relax the restrictions imposed by the political branches on the tribes’ inherent prosecutorial authority is consistent with our earlier cases. True, the Court held in those cases that the power to prosecute nonmembers was an aspect of the tribes’ external relations and hence part of the tribal sovereignty that was divested by treaties and by Congress. Wheeler, supra, at 326, 98 S.Ct. 1079; Oliphant v. Suquamish Tribe, 435 U.S. 191, 209-210, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978); Duro, 495 U.S., at 686, 110 S.Ct. 2053. But these holdings reflect the Court’s view of the tribes’ retained sovereign status as of the time the Court made them. They did not set forth constitutional limits that prohibit Congress from changing the relevant legal circumstances, i.e., from taking actions that modify or adjust the tribes’ status.
To the contrary, Oliphant and Duro make clear that the Constitution does not dictate the metes and bounds of tribal autonomy, nor do they suggest that the Court should second-guess the political branches’ own determinations. In Oli-phant, the Court rested its conclusion about inherent tribal authority to prosecute tribe members in large part upon “the commonly shared presumption of Congress, the Executive Branch, and lower federal courts,” a presumption which, “[wjhile not conclusive[,] carries considerable weight.” 435 U.S., at 206, 98 S.Ct. 1011. The Court pointed out that 1206“ ‘Indian law’ draws principally upon the treaties drawn and executed by the Executive Branch and legislation passed by Congress." Ibid, (emphasis added). It added that those “instruments ... form the backdrop for the intricate web of judicially made Indian law.” Ibid, (emphasis added).
Similarly, in Duro, the Court drew upon a host of different sources in order to reach its conclusion that a tribe does not possess the inherent power to prosecute a nonmember. The Court referred to historic practices, the views of experts, the experience of forerunners of modern tribal courts, and the published opinions of the Solicitor of the Department of the Interior. *1637 495 U.S., at 689-692, 110 S.Ct. 2053. See also, e.g., Nevada v. Hicks, 533 U.S. 353, 361, n. 4, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001) (“Our holding in Worcester must be considered in light of ... the 1828 treaty” (alterations and internal quotation marks omitted)); South Dakota v. Bourland, 508 U.S. 679, 695, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993) (“Having concluded that Congress clearly abrogated the Tribe’s preexisting regulatory control over non-Indian hunting and fishing, we find no evidence in the relevant treaties or statutes that Congress intended to allow the Tribes to assert regulatory jurisdiction over these lands pursuant to 'inherent sovereignty" (emphasis added)); National Farmers Union Ins. Cos. v. Crow Tribe, 471 U.S. 845, 855-856, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985) (“[T]he existence and extent of a tribal court’s jurisdiction will require [inter alia] a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions”); United States v. Kagama, 118 U.S. 375, 382-383, 6 S.Ct. 1109, 30 L.Ed. 228 (1886) (characterizing Ex parte Crow Dog, 109 U.S. 556, 570, 3 S.Ct. 396, 27 L.Ed. 1030 (1883), as resting on extant treaties and statutes and recognizing congressional overruling of Crow Dog).
Thus, the Court in these cases based its descriptions of inherent tribal authority upon the sources as they existed at the time the Court issued its decisions. Congressional legislation constituted one such important source. And that source was subject to change. Indeed Duro itself an-ticjmted2w change by inviting interested parties to “address the problem [to] Congress.” 495 U.S., at 698, 110 S.Ct. 2053.
We concede that Duro, like several other cases, referred only to the need to obtain a congressional statute that “delegated” power to the tribes. See id., at 686, 110 S.Ct. 2053 (emphasis added); Bourland, supra, at 695, n. 15, 113 S.Ct. 2309; Montana v. United States, 450 U.S. 544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); Mazurie, 419 U.S., at 556-557, 95 S.Ct. 710. But in so stating, Duro (like the other cases) simply did not consider whether a statute, like the present one, could constitutionally achieve the same end by removing restrictions on the tribes’ inherent authority. Consequently we do not read any of these cases as holding that the Constitution forbids Congress to change “judicially made” federal Indian law through this kind of legislation. Oliphant, supra, at 206, 98 S.Ct. 1011; cf. County of Oneida v. Oneida Indian Nation of N. Y., 470 U.S. 226, 233-237, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (recognizing the “federal common law” component of Indian rights, which “common law” federal courts develop as “a ‘necessary expedient’ when Congress has not ‘spoken to a particular issue’ ” (quoting Milwaukee v. Illinois, 451 U.S. 304, 313-315, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981))); id., at 313, 101 S.Ct. 1784 (“[Fjederal common law is ‘subject to the paramount authority of Congress’ ” (quoting New Jersey v. New York, 283 U.S. 336, 348, 51 S.Ct. 478, 75 L.Ed. 1104 (1931))).
Wheeler, Oliphant, and Duro, then, are not determinative because Congress has enacted a new statute, relaxing restrictions on the bounds of the inherent tribal authority that the United States recognizes. And that fact makes all the difference.
Ill
Lara makes several additional arguments. First, he points out that the Indian Civil Rights Act of 1968, 82 Stat. 77, lacks certain constitutional protections for criminal defendants, in particular the right of an indigent defendant to counsel. See 25 U.S.C. § 1302. And he argues that the Due Process Clause forbids Congress to permit a tribe to prosecute a nonmember *1638 Indian citizen of the United States |¾⅜⅛ a forum that lacks this protection. See Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972) (Constitution guarantees indigents counsel where imprisonment possible).
Lara’s due process argument, however, suffers from a critical structural defect. To explain the defect, we contrast this argument with Lara’s “lack of constitutional power” argument discussed in Part II, supra. Insofar as that “constitutional power” argument might help Lara win his double jeopardy claim, it must proceed in four steps:
Step One: Congress does not possess the constitutional power to enact a statute that modifies tribal power by “recognizing] and affirming]” the tribes’ “inherent” authority to prosecute nonmember Indians. 25 U.S.C. § 1301(2).
Step Two: Consequently, the word “inherent” in the statute’s phrase “inherent power” is void.
Step Three: The word “inherent” is sev-erable from the rest of the statute (as are related words). The remainder of the statute is valid without those words, but it then delegates federal power to the tribe to conduct the prosecution.
Step Four: Consequently, the Tribe’s prosecution of Lara was federal. The current, second, prosecution is also federal. Hence Lara wins his Double Jeopardy Clause claim, the subject of the present proceeding.
Although the Eighth Circuit accepted this argument, 324 F.3d, at 640, we reject Step One of the argument, Part II, supra. That rejection, without more, invalidates the argument.
Lara’s due process argument, however, is significantly different. That argument (if valid) would show that any prosecution of a nonmember Indian under the statute is invalid; so Lara’s tribal prosecution would be invalid, too. Showing Lara’s tribal prosecution was invalid, however, does not show that the source of that tribal prosecution was federal power (showing that a state prosecution violated the Due Process Clause does not make that prosecution federal). |awBut without that “federal power” showing, Lara cannot win his double jeopardy claim here. Hence, we need not, and we shall not, consider the merits of Lara’s due process claim. Other defendants in tribal proceedings remain free to raise that claim should they wish to do so. See 25 U.S.C. § 1303 (vesting district courts with jurisdiction over habeas writs from tribal courts).
Second, Lara argues that Congress’ use of the words “all Indians,” in the statutory phrase “inherent power ... to exercise criminal jurisdiction over all Indians,” violates the Equal Protection Clause. He says that insofar as the words include nonmember Indians within the statute’s scope (while excluding all non-Indians) the statute is race based and without justification. Like the due process argument, however, this equal protection argument is simply beside the point, therefore we do not address it. At best for Lara, the argument (if valid) would show, not that Lara’s first conviction was federal, but that it was constitutionally defective. And that showing cannot help Lara win his double jeopardy claim.
Third, Lara points out that the Duro Court found the absence of certain constitutional safeguards, for example, the guarantee of an indigent’s right to counsel, as an important reason for concluding that tribes lacked the “inherent power” to try a “group of citizens” (namely, nonmember Indians) who were not “includefd]” in those “political bodies.” 495 U.S., at 693-694, 110 S.Ct. 2053. In fact, Dura says *1639 the following: “We hesitate to adopt a view of tribal sovereignty that would single out another group of citizens, nonmember Indians, for trial by political bodies that do not include them.” Id., at 693, 110 S.Ct. 2053. But this argument simply repeats the due process and equal protection arguments rejected above in a somewhat different form. Since precisely the same problem would exist were we to treat the congressional statute as delegating federal power, this argument helps Lara no more than the others.
I210IV
For these reasons, we hold, with the reservations set forth in Part III, supra, that the Constitution authorizes Congress to permit tribes, as an exercise of their inherent tribal authority, to prosecute nonmember Indians. We hold that Congress exercised that authority in writing this statute. That being so, the Spirit Lake Tribe’s prosecution of Lara did not amount to an exercise of federal power, and the Tribe acted in its capacity of a separate sovereign. Consequently, the Double Jeopardy Clause does not prohibit the Federal Government from proceeding with the present prosecution for a discrete federal offense. Heath, 474 U.S., at 88, 106 S.Ct. 433.
The contrary judgment of the Eighth Circuit is

Reversed.

APPENDIX TO OPINION OF THE COURT
Title 25 U.S.C. § 1301(2), as amended by Act of Oct. 28, 1991, 105 Stat. 646, provides:
“ jP’jowers of self-government’ means and includes all governmental powers possessed by an Indian tribe, executive, legislative, and judicial, and all offices, bodies, and tribunals by and through which they are executed, including courts of Indian offenses; and means the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians.”