Justice THOMAS, concurring.
I join the Court's opinion in full but write separately to explain why constitutional avoidance compels this outcome. Each party in this case has put forward a plausible interpretation of the relevant sections of the Indian Child Welfare Act (ICWA). However, the interpretations offered by respondent Birth Father and the United States raise significant constitutional problems as applied to this case. Because the Court's decision avoids those problems, I concur in its interpretation.
I
This case arises out of a contested state-court adoption proceeding. Adoption proceedings are adjudicated in state family courts across the country every day, and "domestic relations" is "an area that has long been regarded as a virtually exclusive province of the States." Sosna v. Iowa, 419 U.S. 393, 404, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). Indeed, "[t]he whole subject of the *657 domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States." In re Burrus, 136 U.S. 586, 593-594, 10 S.Ct. 850, 34 L.Ed. 500 (1890). Nevertheless, when Adoptive Couple filed a petition in South Carolina Family Court to finalize their adoption of Baby Girl, Birth Father, who had relinquished his parental rights via a text message to Birth Mother, claimed a federal right under the ICWA to block the adoption and to obtain custody.
The ICWA establishes "federal standards that govern state-court child custody proceedings involving Indian children." Ante, at 2557. The ICWA defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a *2566 member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). As relevant, the ICWA defines "child custody proceeding," § 1903(1), to include "adoptive placement," which means "the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption," § 1903(1)(iv), and "termination of parental rights," which means "any action resulting in the termination of the parent-child relationship," § 1903(1)(ii).
The ICWA restricts a state court's ability to terminate the parental rights of an Indian parent in two relevant ways. Section 1912(f) prohibits a state court from involuntarily terminating parental rights "in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Section 1912(d) prohibits a state court from terminating parental rights until the court is satisfied "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." A third provision creates specific *658 placement preferences for the adoption of Indian children, which favor placement with Indians over other adoptive families. § 1915(a). Operating together, these requirements often lead to different outcomes than would result under state law. That is precisely what happened here. See ante, at 2559 ("It is undisputed that, had Baby Girl not been 3/256 Cherokee, Biological Father would have had no right to object to her adoption under South Carolina law").
The ICWA recognizes States' inherent "jurisdiction over Indian child custody proceedings," § 1901(5), but asserts that federal regulation is necessary because States "have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families," ibid. However, Congress may regulate areas of traditional state concern only if the Constitution grants it such power. Admt. 10 ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people"). The threshold question, then, is whether the Constitution grants Congress power to override state custody law whenever an Indian is involved.
II
The ICWA asserts that the Indian Commerce Clause, Art. I, § 8, cl. 3, and "other constitutional authority" provides Congress with "plenary power over Indian affairs." § 1901(1). The reference to "other constitutional authority" is not illuminating, and I am aware of no other enumerated power that could even arguably support Congress' intrusion into this area of traditional state authority. See Fletcher, The Supreme Court and Federal Indian Policy, 85 Neb. L.Rev. 121, 137 (2006) ("As a matter of federal constitutional law, the Indian Commerce Clause grants Congress the only explicit constitutional authority to deal with Indian tribes"); Natelson, The Original Understanding of the Indian Commerce Clause, 85 Denver U.L.Rev. 201, 210 (2007)
*659 (hereinafter Natelson) (evaluating, and rejecting, other potential sources of authority supporting congressional power over Indians). The assertion of plenary authority must, therefore, stand or fall on Congress' power under the Indian Commerce Clause. Although this Court has said that the "central function of *2567 the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs," Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 192, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989), neither the text nor the original understanding of the Clause supports Congress' claim to such "plenary" power.
A
The Indian Commerce Clause gives Congress authority "[t]o regulate Commerce ... with the Indian tribes." Art. I, § 8, cl. 3 (emphasis added). "At the time the original Constitution was ratified, 'commerce' consisted of selling, buying, and bartering, as well as transporting for these purposes." United States v. Lopez, 514 U.S. 549, 585, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (THOMAS, J., concurring). See also 1 S. Johnson, A Dictionary of the English Language 361 (4th rev. ed. 1773) (reprint 1978) (defining commerce as "Intercourse; exchange of one thing for another; interchange of any thing; trade; traffick"). "[W]hen Federalists and Anti-Federalists discussed the Commerce Clause during the ratification period, they often used trade (in its selling/bartering sense) and commerce interchangeably." Lopez, supra, at 586, 115 S.Ct. 1624 (THOMAS, J., concurring). The term "commerce" did not include economic activity such as "manufacturing and agriculture," ibid., let alone noneconomic activity such as adoption of children.
Furthermore, the term "commerce with Indian tribes" was invariably used during the time of the founding to mean " 'trade with Indians.' " See, e.g., Natelson, 215-216, and n. 97 (citing 18th-century sources); Report of Committee on Indian Affairs (Feb. 20, 1787), in 32 Journals of the Continental Congress 1774-1789, pp. 66, 68 (R. Hill ed. 1936) (hereinafter J. Cont'l Cong.) (using the phrase "commerce with the *660 Indians" to mean trade with the Indians). And regulation of Indian commerce generally referred to legal structures governing "the conduct of the merchants engaged in the Indian trade, the nature of the goods they sold, the prices charged, and similar matters." Natelson 216, and n. 99.
The Indian Commerce Clause contains an additional textual limitation relevant to this case: Congress is given the power to regulate Commerce "with the Indian tribes ." The Clause does not give Congress the power to regulate commerce with all Indian persons any more than the Foreign Commerce Clause gives Congress the power to regulate commerce with all foreign nationals traveling within the United States. A straightforward reading of the text, thus, confirms that Congress may only regulate commercial interactions-"commerce"-taking place with established Indian communities-"tribes." That power is far from "plenary."
B
Congress' assertion of "plenary power" over Indian affairs is also inconsistent with the history of the Indian Commerce Clause. At the time of the founding, the Clause was understood to reserve to the States general police powers with respect to Indians who were citizens of the several States. The Clause instead conferred on Congress the much narrower power to regulate trade with Indian tribes-that is, Indians who had not been incorporated into the body-politic of any State.
1
Before the Revolution, most Colonies adopted their own regulations governing Indian trade. See Natelson 219, and n. 121 (citing colonial laws). Such regulations were necessary because colonial traders all too often abused their Indian trading partners, through fraud, exorbitant *2568 prices, extortion, and physical invasion of Indian territory, among other things. See 1 F. Prucha, The Great Father 18-20 *661 (1984) (hereinafter Prucha); Natelson 220, and n. 122. These abuses sometimes provoked violent Indian retaliation. See Prucha 20. To mitigate these conflicts, most Colonies extensively regulated traders engaged in commerce with Indian tribes. See e.g., Ordinance to Regulate Indian Affairs, Statutes of South Carolina (Aug. 31, 1751), in 16 Early American Indian Documents: Treaties and Laws, 1607-1789, pp. 331-334 (A. Vaughan and D. Rosen eds. 1998).[1] Over time, commercial regulation at the colonial level proved largely ineffective, in part because "[t]here was no uniformity among the colonies, no two sets of like regulations." Prucha 21.
Recognizing the need for uniform regulation of trade with the Indians, Benjamin Franklin proposed his own "articles of confederation" to the Continental Congress on July 21, 1775, which reflected his view that central control over Indian affairs should predominate over local control. 2 J. Cont'l Cong. 195-199 (W. Ford ed. 1905). Franklin's proposal was not enacted, but in November 1775, Congress empowered a committee to draft regulations for the Indian trade. 3 id., at 364, 366. On July 12, 1776, the committee submitted a draft of the Articles of Confederation to Congress, which incorporated many of Franklin's proposals. 5 id., at 545, 546, n. 1. The draft prohibited States from waging offensive war against the Indians without congressional authorization and granted Congress the exclusive power to acquire land from the Indians outside state boundaries, once those boundaries had been established. Id., at 549. This *662 version also gave Congress " the sole and exclusive Right and Power of ... Regulating the Trade, and managing all Affairs with the Indians." Id. at 550.
On August 20, 1776, the Committee of the Whole presented to Congress a revised draft, which provided Congress with "the sole and exclusive right and power of ... regulating the trade, and managing all affairs with the Indians." Id., at 672, 681-682. Some delegates feared that the Articles gave Congress excessive power to interfere with States' jurisdiction over affairs with Indians residing within state boundaries. After further deliberation, the final result was a clause that included a broad grant of congressional authority with two significant exceptions: "The United States in Congress assembled shall also have the sole and exclusive right and power of ... regulating the trade and managing all affairs with the Indians, not members of any of the States, provided that the legislative right of any State within its own limits be not infringed or violated." Articles of Confederation, Art. IX, cl. 4. As a result, Congress retained exclusive jurisdiction over Indian affairs outside the borders of the States; the States retained exclusive jurisdiction over relations with Member-Indians;[2] and Congress and *2569 the States "exercise[d] concurrent jurisdiction over transactions with tribal Indians within state boundaries, but congressional decisions would have to be in compliance with local law." Natelson 230. The drafting of the Articles of Confederation reveals the delegates' concern with protecting the power of the States to regulate Indian persons who were politically incorporated into the States. This concern for state power reemerged during the drafting of the Constitution. *663 2
The drafting history of the Constitutional Convention also supports a limited construction of the Indian Commerce Clause. On July 24, 1787, the convention elected a drafting committee-the Committee of Detail-and charged it to "report a Constitution conformable to the Resolutions passed by the Convention." 2 Records of the Federal Convention of 1787, p. 106 (M. Farrand rev. 1966) (J. Madison). During the Committee's deliberations, John Rutledge, the chairman, suggested incorporating an Indian affairs power into the Constitution. Id., at 137, n. 6, 143. The first draft reported back to the convention, however, provided Congress with authority "[t]o regulate commerce with foreign nations, and among the several States," id., at 181 (Madison) (Aug. 6, 1787), but did not include any specific Indian affairs clause. On August 18, James Madison proposed that the Federal Government be granted several additional powers, including the power "[t]o regulate affairs with the Indians as well within as without the limits of the U. States." Id., at 324 (J. Madison) (emphasis added). On August 22, Rutledge delivered the Committee of Detail's second report, which modified Madison's proposed clause. The Committee proposed to add to Congress' power "[t]o regulate commerce with foreign nations, and among the several States" the words, "and with Indians, within the Limits of any State, not subject to the laws thereof." Id., at 366-367 (Journal). The Committee's version, which echoed the Articles of Confederation, was far narrower than Madison's proposal. On August 31, the revised draft was submitted to a Committee of Eleven for further action. Id., at 473 (Journal), 481 (J. Madison). That Committee recommended adding to the Commerce Clause the phrase, "and with the Indian tribes," id., at 493, which the Convention ultimately adopted.
It is, thus, clear that the Framers of the Constitution were alert to the difference between the power to regulate trade with the Indians and the power to regulate all Indian affairs.
*664 By limiting Congress' power to the former, the Framers declined to grant Congress the same broad powers over Indian affairs conferred by the Articles of Confederation. See Prakash, Against Tribal Fungibility, 89 Cornell L.Rev. 1069, 1090 (2004).
During the ratification debates, opposition to the Indian Commerce Clause was nearly nonexistent. See Natelson 248 (noting that Robert Yates, a New York Anti-Federalist was "almost the only writer who objected to any part [of] of the Commerce Clause-a clear indication that its scope was understood to be fairly narrow" (footnote omitted)). Given the Anti-Federalists' vehement opposition to the Constitution's other grants of power to the Federal Government, this silence is revealing. The ratifiers almost certainly understood the Clause to confer a relatively modest power on Congress-namely, the power to regulate trade with Indian tribes living beyond state borders. And this feature of the Constitution was welcomed by Federalists and Anti-Federalists alike due to the considerable interest in expanding trade with such Indian tribes. See, e.g., The Federalist No. 42, at 265 (J. Madison)
*2570 (praising the Constitution for removing the obstacles that had existed under the Articles of Confederation to federal control over "trade with Indians" (emphasis added)); 3 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 580 (2d ed. 1863) (Adam Stephens, at the Virginia ratifying convention, June 23, 1788, describing the Indian tribes residing near the Mississippi and "the variety of articles which might be obtained to advantage by trading with these people"); The Federalist No. 24, at 158 (A. Hamilton) (arguing that frontier garrisons would "be keys to the trade with the Indian nations"); Brutus, (Letter) X, N.Y. J., Jan. 24, 1788, in 15 The Documentary History of the Ratification of the Constitution 462, 465 (J. Kaminski & G. Saladino eds. 2012) (conceding that there must be a standing army for some purposes, including "trade with Indians"). There *665 is little evidence that the ratifiers of the Constitution understood the Indian Commerce Clause to confer anything resembling plenary power over Indian affairs. See Natelson 247-250.
III
In light of the original understanding of the Indian Commerce Clause, the constitutional problems that would be created by application of the ICWA here are evident. First, the statute deals with "child custody proceedings," § 1903(1), not "commerce." It was enacted in response to concerns that "an alarmingly high percentage of Indian families [were] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies." § 1901(4). The perceived problem was that many Indian children were "placed in non-Indian foster and adoptive homes and institutions." Ibid. This problem, however, had nothing to do with commerce.
Second, the portions of the ICWA at issue here do not regulate Indian tribes as tribes. Sections 1912(d) and (f), and § 1915(a) apply to all child custody proceedings involving an Indian child, regardless of whether an Indian tribe is involved. This case thus does not directly implicate Congress' power to "legislate in respect to Indian tribes ." United States v. Lara, 541 U.S. 193, 200, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004) (emphasis added). Baby Girl was never domiciled on an Indian Reservation, and the Cherokee Nation had no jurisdiction over her. Cf. Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 53-54, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (holding that the Indian Tribe had exclusive jurisdiction over child custody proceedings, even though the children were born off the reservation, because the children were "domiciled" on the reservation for purposes of the ICWA). Although Birth Father is a registered member of The Cherokee Nation, he did not live on a reservation either. He was, thus, subject to the laws of the State in which he resided (Oklahoma) and of the State where his daughter resided during the custody proceedings (South Carolina).
*666 Nothing in the Indian Commerce Clause permits Congress to enact special laws applicable to Birth Father merely because of his status as an Indian.[3]
*2571 Because adoption proceedings like this one involve neither "commerce" nor "Indian tribes," there is simply no constitutional basis for Congress' assertion of authority over such proceedings. Also, the notion that Congress can direct state courts to apply different rules of evidence and procedure merely because a person of Indian descent is involved raises absurd possibilities. Such plenary power would allow Congress to dictate specific rules of criminal procedure for state-court prosecutions against Indian defendants. Likewise, it would allow Congress to substitute federal law for state law when contract disputes involve Indians. But the Constitution does not grant Congress power to override state law whenever that law happens to be applied to Indians. Accordingly, application of the ICWA to these child custody proceedings would be unconstitutional.
* * *
Because the Court's plausible interpretation of the relevant sections of the ICWA avoids these constitutional problems, I concur.

For this reason, the South Carolina Supreme Court held that Birth Father did not give valid consent to Baby Girl's adoption when, four months after her birth, he signed papers stating that he accepted service and was not contesting the adoption. See 398 S.C. 625, 645-646, 731 S.E.2d 550, 561 (2012). See also ante, at 2558 - 2559. Petitioners do not challenge this aspect of the South Carolina court's holding.

Petitioners concede that, assuming Birth Father is a "parent" under ICWA, the notice and counsel provisions of 25 U.S.C. §§ 1912(a) and (b) apply to him. See Tr. of Oral Arg. 13.

The majority's discussion of § 1912(d) repeatedly references Birth Father's purported "abandon[ment]" of Baby Girl, ante, at 2562 - 2563, 2563, n. 8, 2563 - 2564, and it contends that its holding with regard to this provision is limited to such circumstances, see ante, at 2563, n. 8; see also ante, at 2571 (BREYER, J., concurring). While I would welcome any limitations on the majority's holding given that it is contrary to the language and purpose of the statute, the majority never explains either the textual basis or the precise scope of its "abandon[ment]" limitation. I expect that the majority's inexact use of the term "abandon [ment]" will sow confusion, because it is a commonly used term of art in state family law that does not have a uniform meaning from State to State. See generally 1 J. Hollinger, Adoption Law and Practice § 4.04[1][a][ii] (2012) (discussing various state-law standards for establishing parental abandonment of a child).