*1967 Justice THOMAS,
concurring.
The Court holds that neither the Sixth Amendment nor the Fifth Amendment’s Due Process Clause prohibits the Government from using Michael Bryant’s uncoun-seled tribal-court convictions as predicates for the federal crime of committing a domestic assault within Indian country. Ante, at 1966; see 18 U.S.C. § 117(a) (making it a federal crime to “commi[t] a domestic assault within ... Indian country” if the person “has a final conviction on at least 2 separate prior occasions in ... Indian tribal court proceedings” for domestic assault and similar crimes). Because our precedents dictate that holding, I join the Court’s opinion.
The fact that this case arose at all, however, illustrates how far afield our Sixth Amendment and Indian-law precedents have gone. Three basic assumptions underlie this case: that the Sixth Amendment ordinarily bars the Government from introducing, in a later proceeding, convictions obtained in violation of the right to counsel, ante, at 1962-1963; that tribes’ retained sovereignty entitles them to prosecute tribal members in proceedings that are not subject to the Constitution, ante, at 1961 -1962; and that Congress can punish assaults that tribal members commit against each other on Indian land, ante, at 1960-1962. Although our precedents have endorsed these assumptions for decades, the Court has never identified a sound constitutional basis for any of them, and I see none.
Start with the notion that the Sixth Amendment generally prohibits the government from using a prior, uncounseled conviction obtained in violation of the right to counsel as a predicate for a new offense in a new proceeding. Ante, at 1962. All that the text of the Sixth Amendment requires in a criminal prosecution is that the accused enjoy the “[assistance of [counsel” in that proceeding. The Court was likely wrong in Burgett v. Texas, 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967), when it created a Sixth Amendment “exclusionary rule” that prohibits the government from using prior convictions obtained in violation of the right to counsel in subsequent proceedings to avoid “eroding] the principle” of the right to counsel. Id., at 115, 88 S.Ct. 258. I would be open to reconsidering Burgett in a future case.
The remaining two assumptions underpinning this case exemplify a central tension within our Indian-law jurisprudence. On the one hand, the only reason why tribal courts had the power to convict Bryant in proceedings where he had no right to counsel is that such prosecutions are a function of a tribe’s core sovereignty. See United States v. Lara, 541 U.S. 193, 197, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004); United States v. Wheeler, 435 U.S. 313, 318, 322-323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). By virtue of tribes’ status as “‘separate sovereigns pre-exist-ing the Constitution,’ ” tribal prosecutions need not, under our precedents, comply with “ ‘those constitutional provisions framed specifically as limitations on federal or state authority.’” Ante, at 1962 (quoting Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978)).
On the other hand, the validity of Bryant’s ensuing federal conviction rests upon a contrary view of tribal sovereignty. Congress ordinarily lacks authority to enact a general federal criminal law proscribing domestic abuse. See United States v. Morrison, 529 U.S. 598, 610-613, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). But, the Court suggests, Congress must intervene on reservations to ensure that prolific domestic abusers receive sufficient punishment. See ante, at 1960 -1961. The Court does not explain where Congress’ *1968 power to act comes from, but our precedents leave no doubt on this score. Congress could make Bryant’s domestic assaults a federal crime subject to federal prosecution only because our precedents have endowed Congress with an “all-encompassing” power over all aspects of tribal sovereignty. Wheeler, supra, at 319, 98 S.Ct. 1079. Thus, even though tribal prosecutions of tribal members are purportedly the apex of tribal sovereignty, Congress can second-guess how tribes prosecute domestic abuse perpetrated by Indians against other Indians on Indian land by virtue of its “plenary power” over Indian tribes. See United States v. Kagama, 118 U.S. 375, 382-384, 6 S.Ct. 1109, 30 L.Ed. 228 (1886); accord, Lara, 541 U.S., at 200, 124 S.Ct. 1628.
I continue to doubt whether either view of tribal sovereignty is correct. See id., at 215, 124 S.Ct. 1628 (THOMAS, J., concurring in judgment). Indian tribes have varied origins, discrete treaties with the United States, and different patterns of assimilation and conquest. In light of the tribes’ distinct histories, it strains credulity to assume that all tribes necessarily retained the sovereign prerogative of prosecuting their own members. And by treating all tribes as possessing an identical quantum of sovereignty, the Court’s precedents have made it all but impossible to understand the ultimate source of each tribe’s sovereignty and whether it endures. See Prakash, Against Tribal Fungibility, 89 Cornell L. Rev. 1069, 1070-1074, 1107-1110 (2004).
Congress’ purported plenary power over Indian tribes rests on even shakier foundations. No enumerated power—not Congress’ power to “regulate Commerce ... with Indian Tribes,” not the Senate’s role in approving treaties, nor anything else— gives Congress such sweeping authority. See Lara, supra, at 224-225, 124 S.Ct. 1628 (THOMAS, J., concurring in judgment); Adoptive Couple v. Baby Girl, 570 U.S. -,-, 133 S.Ct. 2552, 2566-2568, 186 L.Ed.2d 729 (2013) (THOMAS, J., concurring). Indeed, the Court created this new power because it was unable to find an enumerated power justifying the federal Major Crimes Act, which for the first time punished crimes committed by Indians against Indians on Indian land. See Kagama, supra, at 377-380, 6 S.Ct. 1109; cf. ante, at 1960. The Court asserted: “The power of the General Government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection.... It must exist in that government, because it has never existed anywhere else.” Kagama, supra, at 384, 6 S.Ct. 1109. Over a century later, Kagama endures as the foundation of this doctrine, and the Court has searched in vain for any valid constitutional justification for this unfettered power. See, e.g., Lone Wolf v. Hitchcock, 187 U.S. 553, 566-567, 23 S.Ct. 216, 47 L.Ed. 299 (1903) (relying on Kaga-ma’s race-based plenary power theory); Winton v. Amos, 255 U.S. 373, 391-392, 56 Ct.Cl. 472, 41 S.Ct. 342, 65 L.Ed. 684 (1921) (Congress’ “plenary authority” is based on Indians’ “condition of tutelage or dependency”); Wheeler, supra, at 319, 98 S.Ct. 1079 (Winton and Lone Wolf illustrate the “undisputed fact that Congress has plenary authority” over tribes); Lara, supra, at 224, 124 S.Ct. 1628 (THOMAS, J., concurring in judgment) (“The Court utterly fails to find any provision of the Constitution that gives Congress enumerated power to alter tribal sovereignty”).
It is time that the Court reconsider these precedents. Until the Court ceases treating all Indian tribes as an undifferentiated mass, our case law will remain bedeviled by amorphous and ahistorical assumptions about the scope of tribal sovereignty. And, until the Court rejects *1969 the fiction that Congress possesses plenary power over Indian affairs, our precedents will continue to be based on the paternalistic theory that Congress must assume all-encompassing control over the “remnants of a race” for its own good. Kagama, supra, at 384, 6 S.Ct. 1109.