# SUPREME COURT OF THE UNITED STATES

## QUENTIN VENENO, JR. *v.* UNITED STATES

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 24–5191.   Decided November 10, 2025

The petition for a writ of certiorari is denied.

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, dissenting from the denial of certiorari.

Petitioner asks us to grant review in this case to reconsider *United States* v. *Kagama*, 118 U. S. 375 (1886). *Kagama* helped usher into our case law the theory that the federal government enjoys "plenary power" over the internal affairs of Native American Tribes. It is a theory that should make this Court blush. Not only does that notion lack any foundation in the Constitution; its roots lie instead only in archaic prejudices. This Court is responsible for *Kagama*, and this Court holds the power to correct it. We should not shirk from the task.

As "sovereign and independent states," Native American Tribes have governed their internal affairs "from time immemorial." *Worcester* v. *Georgia*, 6 Pet. 515, 559–561 (1832) (internal quotation marks omitted). Among the sovereign powers Tribes have always enjoyed is the power to redress crimes involving their own peoples. Reflecting as much, a great many Tribes today have courts, not wholly unlike those found in States and counties across the country, open to render justice when one tribal member commits an offense against another on tribal land.

In the Major Crimes Act of 1885, the federal government sought to curtail these traditional sovereign tribal powers. There, Congress effectively wrote its own Indian criminal code, directing that tribal members who commit certain major crimes against other tribal members within "Indian

country" may be tried and punished in federal court. *Kagama*, 118 U. S., at 377; see 23 Stat. 385. The Act may not have completely displaced tribal criminal-justice authorities. See *United States* v. *Wheeler*, 435 U. S. 313, 330–331 (1978). Even so, the law surely represented a sweeping assertion of federal power, one that would be unthinkable elsewhere in the United States. Yes, of course, Congress may adopt a variety of criminal laws consistent with its "limited" and "enumerated" powers under the Constitution. *McCulloch* v. *Maryland*, 4 Wheat. 316, 406 (1819). But, no, Congress does not enjoy some "general right to punish" crimes of its choosing "within . . . the States" however and whenever it pleases. *Cohens* v. *Virginia*, 6 Wheat. 264, 426 (1821). Our Constitution "withhold[s] from Congress" that kind of "plenary police power." *United States* v. *Lopez*, 514 U. S. 549, 566 (1995).

Despite these foundational principles, this Court in *Kagama* upheld the Major Crimes Act. To arrive at that result, the Court relied on "little more than *ipse dixit*." *Haaland* v. *Brackeen*, 599 U. S. 255, 357 (2023) (THOMAS, J., dissenting). It had to. Congress's limited and enumerated powers no more include some plenary power over the internal affairs of Tribes than they do over the internal affairs of States. *Id.*, at 318–319 (GORSUCH, J., concurring).

*Kagama* itself all but admitted as much. Before the Court, the federal government argued that the Act represented a permissible exercise of Congress's power under the Constitution's Indian Commerce Clause. See Art. I, §8, cl. 3; Brief for United States in *United States* v. *Kagama,* O. T. 1885, No. 1246, p. 23. But the Court rejected that argument, and rightly so, calling it "a very strained construction of th[e] clause." *Kagama*, 118 U. S., at 378. In the Major Crimes Act, after all, the federal government asserted the power to regulate crimes between tribal members on tribal land *"without any reference to their relation to any kind of commerce." Id.*, at 378–379 (emphasis added). And

while the Indian Commerce Clause may afford Congress considerable authority over "bilateral relations with the Tribes," nothing in it authorizes Congress to "reassign to the federal government inherent sovereign authorities that belong to the Tribes." *Brackeen*, 599 U. S., at 320, 325 (GORSUCH, J., concurring) (internal quotation marks and alterations omitted).

Having dismissed the government's central defense of the Act, the Court was left to advance a hodgepodge of others with no more secure a constitutional footing.  First, the Court invoked the Territories Clause. *Kagama*, 118 U. S., at 379–381.  But that provision affords Congress only the power to make "needful Rules and Regulations" for "Territor[ies] . . . belonging to the United States."  Art. IV, §3, cl. 2.  And while the Clause may allow Congress to establish local governments in Territories belonging to the Nation before they enter the Union as States, it does not authorize Congress "to exercise municipal jurisdiction" over non-federal lands within a State and over which another sovereign exercises authority.  See *Lessee of Pollard* v. *Hagan*, 3 How. 212, 223–224 (1845).  Accordingly, that Clause can hardly supply authority for Congress to regulate conduct on tribal lands within States.  Nor, for that matter, does the Clause, rightly understood, endow the federal government with plenary power even within the Territories themselves. *United States* v. *Vaello Madero*, 596 U. S. 159, 184–185 (2022) (GORSUCH, J., concurring).

Next, and leaving the Constitution behind, the *Kagama* Court gestured to the European doctrine of discovery. 118 U. S., at 381–382.  But our Constitution makes no mention of that doctrine.  Nor, at least as conceived by the Marshall Court shortly after the Nation's founding, does the doctrine imply plenary federal power over internal tribal affairs.  As that Court put it, even after the European "discovery" of North America, Tribes remained "distinct, independent political communities retaining their original natural rights,"

with only "the *single exception*" that they could have no "intercourse with any other European potentate than the first discoverer." *Worcester*, 6 Pet., at 546, 559 (emphasis added).

From this, one might glean that the discovery doctrine meant one European nation could assert certain exclusive "rights" of intercourse with Tribes as "against all other European" claimants. R. Clinton, The Proclamation of 1763: Colonial Prelude to Two Centuries of Federal-State Conflict Over the Management of Indian Affairs, 69 B. U. L. Rev. 329, 332, n. 6 (1989). Perhaps, too, the doctrine meant that a private party could not buy tribal land without approval from the relevant European national authority. *Johnson's Lessee* v. *McIntosh*, 8 Wheat. 543, 604–605 (1823). But even on its own terms, the Marshall Court appreciated, the discovery doctrine did nothing to strip Native American Tribes of "the rights which belong to self government." *Worcester*, 6 Pet., at 580; see also K. Richotte, The Worst Trickster Story Ever Told: Native America, the Supreme Court, and the U. S. Constitution 26–27 (2025); N. Newton, Federal Power Over Indians: Its Sources, Scope, and Limitations, 132 U. Pa. L. Rev. 195, 208–210 (1984).*

Lacking any other way to uphold the Act, the *Kagama* Court ultimately resorted to archaic colonial prejudices nowhere found in our republican Constitution and wholly antithetical to it. The Major Crimes Act, the Court insisted, should be left to stand because "Indian tribes *are* the wards

───────────

*Even as articulated by the Marshall Court, the discovery doctrine leaves much to be desired. If "discovering" a land is enough to secure certain rights over it, one might wonder why Native Americans hadn't obtained those rights over their lands long before Europeans arrived. As one commentator had already asked by the time of the Nation's founding: "If sailing along a coast can give a right to a country, then might the people of Japan become, as soon as they please, the proprietors of Britain"? R. Price, Observations on the Nature of Civil Liberty, the Principles of Government, and the Justice and Policy of the War with America 23 (1776) (emphasis deleted).

of the nation" and "communities *dependent* on the United States . . . for their daily food."  118 U. S., at 383–384 (emphasis in original).  Their "very weakness and helplessness," the Court continued, imposed a "duty of protection" upon Congress that came with a corresponding "power." *Id.*, at 384.  As the Court saw it, "[t]he power of the General Government over these remnants of a race once powerful, now weak and diminished in numbers, [was] necessary to their protection." *Ibid.*

For decades, what followed in *Kagama*'s wake was more of the same.  In one decision after another, this Court did not look to the Constitution for guidance on the scope of the federal government's powers over tribal affairs.  Instead, and often citing *Kagama* as authority, the Court suggested that the government could exercise a free-floating "[p]lenary authority" over Tribes because they are "wea[k] and helples[s]," *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, 565, 567 (1903), and composed of "simple, uninformed and inferior people" who find themselves in the care of "a superior and civilized nation," *United States* v. *Sandoval*, 231 U. S. 28, 39, 46 (1913).

The plenary power theory *Kagama* helped spawn not only lacked any basis in the Constitution.  It also injected a new "incoherence into our Indian-law jurisprudence." *Brackeen*, 599 U. S., at 329 (GORSUCH, J., concurring).  Since the founding and to this day, this Court has acknowledged that Congress enjoys only limited and enumerated powers and that Tribes are "sovereign and independent states." *Worcester*, 6 Pet., at 561 (internal quotation marks omitted); see also *Wheeler*, 435 U. S., at 331.  Yet, thanks to decisions like *Kagama*, this Court has also sometimes suggested that Congress enjoys plenary power to "regulate virtually every aspect of the tribes." *United States* v. *Lara*, 541 U. S. 193, 214–215 (2004) (THOMAS, J., concurring in judgment).  "Those two propositions of course clash"

because "only one is true." *Brackeen*, 599 U. S., at 330 (GORSUCH, J., concurring).

Embarrassed equally by the lawlessness of decisions from the "high plenary power era" and the incoherence they introduced into our case law, this Court has, with time, beaten a slow retreat from them. See S. Cleveland, Powers Inherent in Sovereignty: Indians, Aliens, Territories, and the Nineteenth Century Origins of Plenary Power over Foreign Affairs, 81 Texas L. Rev. 1, 62 (2002); see also *Brackeen*, 599 U. S., at 326–330 (GORSUCH, J., concurring) (tracing these developments). Just two years ago, that retreat found notable expression in *Brackeen* where this Court once again recognized that the Constitution affords Congress only "a series of enumerated powers, not a series of blank checks," and that, "like the rest of its legislative powers, Congress's authority to regulate Indians must derive from the Constitution, not the atmosphere." *Id.*, at 273, 276 (majority opinion); see also *id.*, at 330 (GORSUCH, J., concurring).

That is exactly right. And it is exactly why this Court must confront decisions, like *Kagama*, that cannot be explained by the Constitution, but only by the atmosphere of their times. I regret that the Court declines to take up that challenge today. But whether the day of reckoning for the plenary power theory comes sooner or later, it must come.

Nor is that day to be feared. If this Court were to overturn *Kagama*, Tribes could exercise their sovereign powers to address "major" crimes among Indians, something this Court has no business assuming they are too "inferior" or "weak" to do without supervision from a "superior" people. Equally, if Tribes and the government decide that a degree of federal involvement in tribal justice is mutually beneficial, the Constitution affords a lawful way to achieve that end: by treaty. Art. II, §2, cl. 2; see *Worcester*, 6 Pet., at 550–551. The government may be out of practice using that tool. See Act of Mar. 3, 1871, 16 Stat. 566. But Congress

often addressed criminal justice matters in treaties with Tribes before the Major Crimes Act, and it could do so again. See, *e.g.*, 7 Stat. 40–41; 15 Stat. 635–636.

Doubtless, as the government stresses in its opposition to this petition, many of this Court's plenary power decisions have stood for years. Brief in Opposition 22–24. But the same was once said in defense of *Plessy* v. *Ferguson*, 163 U. S. 537 (1896), and *Korematsu* v. *United States*, 323 U. S. 214 (1944). And, as with those cases, our plenary power decisions demand reconsideration if this Court is ever to bring coherence to the law and make good on its promise of fidelity to the Constitution. A matter so grave "'can[not] be settled until settled right.'" F. Coudert, The Evolution of the Doctrine of Territorial Incorporation, 26 Colum. L. Rev. 823, 842 (1926) (quoting Justice John Marshall Harlan).